In the Matter of The EXTRADITION OF Jose Oscar CERVANTES VALLES

No. M–02–008.

United States District Court,
S.D. Texas,
McAllen Division.

March 31, 2003.

760

Maria A Aponte, U.S. Attorney's Office, McAllen, TX, for plaintiff.

Kyle Blair Welch, Federal Public Defender's Office, McAllen, TX, for defendant.

### *MEMORANDUM*

RAMOS, United States Magistrate Judge.

### *I. Overview*

The government of Mexico seeks the extradition of José Oscar Cervantes Valles ("Cervantes–Valles"), a Mexican citizen, pursuant to the extradition treaty which entered into force between the United States of America and the United Mexican States on January 25, 1980.[1] (*See* Docket Entries # 1, 18.) The Mexican government desires to prosecute Cervantes–

---

1. *See* 31 U.S.T. 5059.

Valles for offenses relating to the murder of Guillermo Colorado Saavedra, and the attempted murder of Roberto Carlos Silva Domínguez, both of which occurred in San Luis Potosí, S.L.P., Mexico, on April 28, 1995. (*See, e.g.,* Docket Entry # 1.) The Mexican government also desires to prosecute José Oscar Cervantes Valles for the offense of criminal conspiracy (*i.e.,* criminal or illicit association), arising from the same facts. (*See, e.g., id.*) Because the Respondent presently before the court is clearly not Cervantes–Valles, the extradition request must fail.[2] *See* 31 U.S.T. 5059, art. 14 § 2.

## II. Factual and Procedural Summary

The facts relevant to this case, as set forth in the record, are rather dense.

That which follows, then, is a synthesis of the record. For ease of discussion, the factual and procedural summary is divided into five sections, addressing the following: (a) the identity of the key persons with knowledge of or involvement in the underlying incident; (b) the murder of Guillermo Colorado Saavedra and the initial investigation, (c) Respondent's implication in this case, (d) the deportation of José Oscar Cervantes Valle (clearly someone other than Respondent), and (e) the extradition proceedings against Respondent in the United States District Court.

## A. Key Persons with Knowledge of or Involvement in the Underlying Incident

| Name: | Basic data: |
| --- | --- |
| Oscar Cervantes Valles (a.k.a. Oscar Cervantes, a.k.a. Oscar Cervantes Ovalle, a.k.a. "El Oso")[3] | alleged gunman in the underlying crimes; subject of the present extradition request[4] |
| Armando Valtierra Villanueva[5] | companion of the alleged gunman and alleged co-participant in the underlying crimes[6] |
| Guillermo Hernández Rodríguez[7] | companion of the alleged gunman and alleged co-participant in the underlying crimes[8] |

2. Respondent credibly maintains that his true name is "José Oscar Cervantes González," and not "José Oscar Cervantes Valles." (*See, e.g.,* Transcription of Extradition Hearing of September 9, 2002, at page 3.) Noteworthy is the fact that the name "José Oscar Cervantes González" (which Respondent contends is his true name) is used by the federal government in Respondent's immigration proceedings. (*See, e.g.,* Docket Entry # 12, Exhibit "D".) Clearly, then, some real discrepancy exists between the two names—a fact which the government indeed acknowledges. (*See, e.g.,* Transcription of Extradition Hearing of September 9, 2002, at page 3.)

3. In addition to the name discrepancy previously mentioned, there also exist various possible spellings for the name of the individual sought by the Mexican authorities. (*See, e.g.,* Docket Entry # 1.) For reasons discussed herein, the court believes this individual's true name most likely is José Oscar Cervantes Valle.

4. (*See, e.g.,* Docket Entry # 37, Exhibit "A", at Tabs # 12, 14.)

5. This individual's name is spelled as both "Armando Baltierra Villanueva" and "Armando Valtierra Villanueva" in the record. For example, the copy of the original records in Spanish from the prosecution file in Mexico is observed to spell the name "Armando Baltierra Villanueva." (Docket Entry # 37, Exhibit "A", at Tab # 12.) On the other hand, the diplomatic note spells the name "Armando Valtierra Villanueva." (Docket Entry # 37, Exhibit "A", Diplomatic Note # 003679.) This discrepancy, however, seems to be the result of typographical error, given the fact that the same person is clearly referred to. For clarity, the court will use the spelling set forth in the diplomatic note.

6. (*See, e.g.,* Docket Entry # 37, Exhibit "A", at Tab # 12.)

7. This individual's name is spelled as both "Guillermo Hernández Rodríguez" and

| | |
|---|---|
| **Victor Manuel Priego Rodríguez** | companion of the alleged gunman and co-participant in the underlying crimes [9] |
| **Omar Rodríguez Olivera** [10] | companion of the alleged gunman and alleged co-participant in the underlying crimes [11] |
| **Guillermo Colorado Saavedra** | victim/decedent; owner and operator of a taxi business in San Luis Potosí, S.L.P., Mexico [12] |
| **Eduardo Ramón Colorado Saavedra** | brother of the victim/decedent; taxi driver in San Luis Potosí, S.L.P., Mexico; eyewitness to the crimes [13] |
| **José Alberto Colorado Saavedra** | brother of the victim/decedent; taxi driver in San Luis Potosí, S.L.P., Mexico; eyewitness to the crimes [14] |
| **Alfredo Barrón Rodríguez** | police officer in San Luis Potosí, S.L.P., Mexico, who was on the scene [15] |
| **Luis Jaime Cázares Martínez** | acquaintance of the alleged gunman, but not a co-participant in the underlying crimes [16] |
| **Rosalio Guell Pérez** | taxi driver in San Luis Potosí, S.L.P., Mexico; eyewitness to the getaway from the crimes [17] |
| **Pedro Antonio Hernández Torres** | bystander and eyewitness to the incident; acquaintance of the decedent [18] |

"Guillermo Hernández Loredo" in the record. For example, the copy of the original records in Spanish from the prosecution file in Mexico is observed to spell the name "Guillermo Hernández Loredo." (Docket Entry # 37, Exhibit "A", at Tab # 12.) On the other hand, the diplomatic note spells the name "Guillermo Hernández Rodríguez." (Docket Entry # 37, Exhibit "A", Diplomatic Note # 003679.) After studying the record, the court presumes that the same person is being referred to in both instances. For the sake of clarity, the court will use the spelling set forth in the diplomatic note.

8. (*See, e.g.,* Docket Entry # 37, Exhibit "A", at Tab # 12.)

9. (*See, e.g.,* Docket Entry # 37, Exhibit "A", at Tabs # 12, 14.)

10. This individual's name is spelled as both "Jesús Omar Rodríguez Olivera" and "Omar Rodríguez Olivera" in the record. For example, the copy of the original records in Spanish from the prosecution file in Mexico is observed to spell the name "Jesús Omar Rodríguez Olivera." (Docket Entry # 37, Exhibit "A", at Tab # 12.) On the other hand, the diplomatic note spells the name "Omar Rodríguez Olivera." (Docket Entry # 37, Exhibit

"A", Diplomatic Note # 003679.) Having studied the record, the court presumes that the same person is being referred to in both instances. For clarity, then, the court will use the spelling set forth in the diplomatic note.

11. (*See, e.g.,* Docket Entry # 37, Exhibit "A", at Tab # 12.)

12. (*See, e.g.,* Docket Entry # 37, Exhibit "A", at Tab # 4.)

13. (*See, e.g.,* Docket Entry # 37, Exhibit "A", at Tab # 6.)

14. (*See, e.g.,* Docket Entry # 37, Exhibit "A", at Tab # 4.)

15. (*See, e.g.,* Docket Entry # 37, Exhibit "A", at Tab # 5.)

16. (*See, e.g.,* Docket Entry # 37, Exhibit "A", at Tab # 15.)

17. (*See, e.g.,* Docket Entry # 37, Exhibit "A", at Tab # 7.)

18. (*See, e.g.,* Docket Entry # 37, Exhibit "A", at Tab # 9.)

| Roberto Carlos Silva Domínguez | victim of/eyewitness to the crimes; taxi driver in San Luis Potosí, S.L.P., Mexico [19] |

## B. The Murder of Guillermo Colorado Saavedra and the Initial Investigation

The record indicates that, on the afternoon of April 28, 1995, Cervantes–Valles was cruising the streets of San Luis Potosí, S.L.P., Mexico, in his white Ram Charger vehicle and consuming alcohol. (*See* Docket Entry # 37, Exhibit "A", Diplomatic Note # 003679.) He was accompanied in the vehicle by the following passengers: [20] Omar Rodríguez Olivera ("Rodríguez–Olivera"), Victor Manuel Priego Rodríguez ("Priego–Rodríguez"), Guillermo Hernández Rodríguez, and Armando Valtierra Villanueva ("Valtierra–Villanueva"). (*See id.*) Testimony set forth in the record indicates that, between approximately 1:00 p.m. and about 4:30 p.m. on that date, Cervantes–Valles, alone, had consumed around six (6) "*caguamas*" [21] of beer. (*See* Docket Entry # 37, Exhibit "A", at Tab # 14.)

Meanwhile, the Colorado–Saavedra brothers, along with other taxi drivers, were in the street washing their taxis in preparation for the next shift. (*See, e.g.,* Docket Entry # 37, Exhibit "A", at Tab # 6.) Close to where the taxi drivers were washing their taxis, Cervantes–Valles and his group neared a pair of young women in the street. (*See* Docket Entry # 37, Exhibit "A", Diplomatic Note # 003679.) When the Ram Charger was sufficiently close to the women, Valtierra–Villanueva apparently stuck his hand out of the vehicle and touched the buttocks of one of the females. (*Id.*)

The buttocks-touching incident, which occurred within view of the taxi drivers, led to a heated exchange between Cervantes–Valles and Guillermo Colorado Saavedra. (*See generally* Docket Entry # 37, Exhibit "A", Diplomatic Note # 003679.) After the altercation, Cervantes–Valles, along with the rest of his companions, went to the Cervantes–Valles's residence to retrieve a handgun. (*Id.*) While at the residence, the license plates were removed from the Ram Charger. (*Id.*)

The Ram Charger, with the same occupants, then returned to where the taxi drivers were. (*See* Docket Entry # 37, Exhibit "A", Diplomatic Note # 003679.) Cervantes–Valles got out of the vehicle, carrying the firearm, and shot Guillermo Colorado Saavedra, inflicting mortal wounds. (*Id.*) Cervantes–Valles also shot at another taxi driver, Roberto Carlos Silva Domínguez ("Silva–Domínguez"), but no lasting injury seems to have been inflicted. (Docket Entry # 37, Exhibit "A", Diplomatic Note # 003679; *see also* Docket Entry # 37, Exhibit "A", at Tab # 8.)

When the firearm apparently malfunctioned, Cervantes–Valles and his companions fled the scene in the Ram Charger. (*See generally* Docket Entry # 37, Exhibit "A", Diplomatic Note # 003679.) The taxi drivers tried to detain the fleeing vehicle by hurling rocks at it, but were ultimately unsuccessful in preventing Cervantes–

---

**19.** (*See, e.g.,* Docket Entry # 37, Exhibit "A", at Tab # 8.)

**20.** It seems clear from the totality of the record that Oscar Cervantes was the driver of the Ram Charger at all relevant times. (*See* Docket Entry # 37, Exhibit "A.")

**21.** The court notes that a "caguama" is a large bottle of beer, which is sold in Mexico, containing almost a liter. *See, e.g., Historia, http://www.femsa.com/qsomos_sub.asp?sub_id=historia* (last accessed March 11, 2003).

Valles and his companions from leaving the scene of the shooting in the Ram Charger. (*See* Docket Entry # 37, Exhibit "A", at Tab # 12.) It was not long, however, before at least three taxis caught up with the Ram Charger and tried to detain it. (*Id.*)

At some point in the chase, the pursuing taxi drivers used their vehicles to block the path of the Ram Charger, but the Ram Charger's driver rammed the taxis and kept going. (*See* Docket Entry # 37, Exhibit "A", at Tab # 12.) Another time, the Ram Charger smashed into other taxis which had also tried to block its way. (*Id.*) The Ram Charger ultimately experienced mechanical failure, probably as a consequence of the collisions, causing its occupants to leave the vehicle and continuing to flee on foot. (*Id.*)

At that point, the fleeing occupants of the Ram Charger entered a nearby university campus. In an effort to evade responsibility, Rodríguez–Olivera telephoned authorities to falsely report that the Ram Charger had been stolen. (*Id.*) The occupants of the Ram Charger then dispersed without being caught. (*Id.*)

The initial investigation by the authorities in San Luis Potosí proceeded swiftly, yielding, among other things, the following potentially useful information:

- José Alberto Colorado Saavedra (a brother of the decedent), in his statement to authorities, indicated that the gunman was approximately thirty (30) to thirty-five (35) years of age, was 1.7 meters[22] tall, and had a moustache.

(Docket Entry # 37, Exhibit "A", at Tab # 4.)

- Alfredo Barrón Rodríguez (a San Luis Potosí police officer), in his statement to authorities, indicated that he had participated in the pursuit of the white Ram Charger, and that a bystander eyewitness stated to him that the Ram Charger's occupants had fled to the university after the vehicle broke down. (Docket Entry # 37, Exhibit "A", at Tab # 5.)
- Eduardo Ramón Colorado Saavedra (a brother of the decedent), in his statement to authorities, indicated that the gunman's name was "Oscar."[23] (Docket Entry # 37, Exhibit "A", at Tab # 6.)
- Rosalio Guell Pérez (a taxi driver), in his statement to authorities, indicated that the gunman was about 18 to 20 years of age and about 1.7 meters[24] tall. (Docket Entry # 37, Exhibit "A", at Tab # 7.)
- Silva–Domínguez, in his statement to authorities, indicated that the gunman was probably twenty-three (23) or twenty-five (25) years old. (Docket Entry # 37, Exhibit "A", at Tab # 8.)
- Pedro Antonio Hernández Torres ("Hernández–Torres") (a bystander), in his statement to authorities, indicated that the gunman was around twenty-four (24) years old. (Docket Entry # 37, Exhibit "A", at Tab # 9.)
- *Comandante* Antonio Aguiñaga Piñón, of the *Policía Judicial* in San Luis Potosí, determined that the Ram Charger automobile used in the crime

---

22. The original version of this document in Spanish indicates that the gunman's height was "1.7 cm", which is a clear error in transcription. The court will construe this as an indication that the witness sought to describe the gunman's height as being, instead, 1.7 meters (or 170 centimeters).

23. Looking to his statement to authorities, it seems that Eduardo obtained this information

by questioning the occupant of a residence where the Ram Charger had been observed by the taxi drivers as being parked prior to the shootings.

24. The original version of this document in Spanish indicates that the gunman's height was, simply, "1.7." The court will construe this description to mean 1.7 meters (or 170 centimeters).

had been issued license plates from the Mexican state of Tamaulipas, and was purchased from a Chrysler dealer known as "Autos y Aviones, S.A. de C.V.", in Monterrey.[25] (Docket Entry # 37, Exhibit "A", at Tab # 11.)

● Priego–Rodríguez, in his statement to authorities, indicated that the gunman was named Oscar Cervantes and that the gunman came from Laredo, which is where the gunman lived. (Docket Entry # 37, Exhibit "A", at Tab # 14.) According to Victor Manuel Priego Rodríguez, Oscar Cervantes had a manner of speaking that indicated he was from the border region. (*Id.*) Victor Manuel Priego Rodríguez described Oscar Cervantes as being about twenty-five (25) years old, having a moustache, and being about 1.73 meters[26] in height. (*Id.*)

● Luis Jaime Cázares Martínez (an acquaintance of Oscar Cervantes), in his statement to authorities, indicated that the white Ram Charger vehicle belonged to Oscar Cervantes. (Docket Entry # 37, Exhibit "A", at Tab # 15.) Luis Jaime Cázares Martínez also indicated that, on the date of the crimes, Oscar Cervantes appeared to be newly arrived in San Luis Potosí (in fact, he believed that Oscar Cervantes had only been in San Luis Potosí for about a week, and

that it was Oscar Cervantes's first visit to San Luis Potosí), being from Nuevo Laredo and/or Chicago. (*Id.*) Further, Luis Jaime Cázares Martínez indicated that Oscar Cervantes has a sister named Rocío who lived in San Luis Potosí. (*Id.*)

As a result of the investigation, Oscar Cervantes Valle (or Oscar Cervantes Ovalle) was charged with *homicidio, homicidio en grado de tentativa* and *asociación delictuosa,* the documentation of which provided two addresses for the suspect.[27] (Docket Entry # 37, Exhibit "A", at Tab # 30.) The gunman's companions were also charged with related offenses, the details of which need not be explored at this juncture. (*Id.*)

Despite the efforts dedicated to the investigation of the crime, which are amply demonstrated by the record, the Mexican authorities were not successful in bringing the gunman to justice on Mexican soil.

### C. Respondent's Implication in This Case

Respondent was born in Monterrey, Nuevo León, Mexico in 1969.[28] (*See* Docket Entry # 12, Exhibit "D", at page 1.) He lived with his family in Nuevo León for 24 years. (*Id.*) He married in 1993 and came

---

**25.** The court takes notice that the specified automobile dealer, which is now known as "Car One, S.A. de C.V.", is located in Monterrey, Nuevo León, Mexico. *See generally Car One, S.A. de C V., http://www.autos-y-aviones. com.mx* (last accessed March 11, 2003). Curiously, the file does not indicate precisely who was the record owner of the vehicle.

**26.** The original version of this document in Spanish indicates that the gunman's height was, simply, "1.73." The court will construe this description to mean 1.73 meters.

**27.** The following addresses are given as purportedly being those for Cervantes–Valles: Calle Francisco I. Madero 185, Colonia El Mezquital, San Luis Potosí, S.L.P., Mexico;

and Calle Cadimas 712, Fraccionamiento Residencial Viveros, Nuevo Laredo, Tamaulipas, Mexico.

**28.** Certain factual matters relating to Respondent and his personal history were previously determined by the Board of Immigration Appeals ("BIA")—the nation's highest administrative body for interpreting and applying immigration law. It cannot seriously be argued that the general facts recited by the BIA, in its decision of January 22, 2002 in Respondent's underlying immigration case, are unworthy of reliance by this court. The decision of the BIA will therefore be used by this court to reliably supply, where relevant, certain general factual matters in the case at bar.

to the United States for the first time. (*Id.*)

Respondent's wife, who is a lawful permanent resident of the United States, filed an immigrant visa petition on his behalf in June of 1993. (*See* Docket Entry # 12, Exhibit "D", at page 1.) Thus began Respondent's extensive involvement with the United States immigration system. Respondent's immigration petition was approved by the Immigration and Naturalization Service in July of 1993. (*Id.*)

While Respondent was in this state, a Texas driver's license was issued for him in 1993. (*See* Docket Entry # 12, Exhibit "D", at page 6.) The license shows a Laredo, Texas address for Respondent. (*See, e.g.,* Docket Entry # 37, Exhibit "A", at Tab # 29.) The license also appears to show Respondent's height as being five (5) feet, eight (8) inches.[29] (*Id.*)

Respondent and his wife remained in the United States until September of 1994, at which time they returned to visit his parents in Guadalupe, Nuevo León, Mexico.[30] (*See* Docket Entry # 12, Exhibit "D", at page 2.) They lived with Respondent's parents until May of 1995, at which time they returned to the United States.[31] (*Id.*) Upon returning to the United States in 1995, Respondent and his wife proceeded to work in the states of Texas, Wyoming, and Arkansas. (*Id.*)

At some point, the authorities in San Luis Potosí obtained a copy of Respondent's Texas driver's license. (*See generally* Docket Entry # 37, Exhibit "A", at Tab # 29.) Then, on July 12, 1996, the Mexican authorities showed a copy of Respondent's license photograph to Luis Alberto Colorado Saavedra, Eduardo Ramón Colorado Saavedra[32], Hernández–Torres, and Silva–Domínguez. (*Id.*) All four witnesses positively identified Respondent as the gunman. (*Id.*)

It should also be noted that, during 1996 or 1997, Respondent's wife became a naturalized citizen of the United States. (*See* Docket Entry # 12, Exhibit "D", at page 2.) Thereafter, an adjustment of immigration status was sought, based on Respondent's status as the spouse of a United States citizen. (*Id.*) The application for adjustment of status was pending when the legal matters related to the murder in San Luis Potosí came to the fore. (*See generally id.*)

Mexican authorities subsequently sought the assistance of the FBI with this case, which resulted in Respondent's arrest and placement in removal proceedings with the INS in July of 2000. (*See* Docket Entry # 12, Exhibit "D", at page 2.) Photos of Respondent taken after his detention were then sent to Mexican authorities and placed in a photo array and again shown to witnesses, which perhaps unsurprisingly resulted in the positive identification of Respondent by eyewitnesses. (*See* Docket Entry # 12, Exhibit "D", at page 6.) A curious aspect of the seven-photo array is that it contained two photographs of Respondent (and one of each of five (5) other individuals), and one of the photographs of Respondent was the array's only profile

---

**29.** This height equates to, approximately, 1.73 meters (or 173 centimeters).

**30.** The court notes that Guadalupe is part of the greater Monterrey urban area.

**31.** Respondent and his wife returned to the United States shortly (in fact, a matter of days) after the murder of Guillermo Colorado Saavedra.

**32.** Although the Mexican prosecution file merely identifies the witness as "Eduardo Colorado Saavedra", the court is confident that this is the same individual as Eduardo Ramón Colorado Saavedra (who, as previously noted, is the decedent's brother).

shot. (*See* Docket Entry #37, Exhibit "B".)

At Respondent's hearing before the Immigration Judge on September 19, 2000, the Colorado Saavedra brothers appeared as witnesses, making an in-court identification of Respondent as the gunman. (*See* Docket Entry #12, Exhibit "D", at page 5.) The immigration judge's decision, wherein adjustment of status was denied, issued on October 31, 2000. (*See* Docket Entry #12, Exhibit "D", at page 1.) Respondent's appeal to the Board of Immigration Appeals was, however, sustained in a decision dated January 22, 2002. (*Id.*)

Respondent's case was remanded to the Immigration Court by the BIA. (*See* Docket Entry #12, Exhibit "D", at page 1.) After remand, Respondent was released on his own recognizance by the Immigration Court. (*See* Docket Entry #12, Exhibit "F".) The order releasing Respondent from immigration custody, signed by Immigration Judge Howard E. Achtsam, issued on February 21, 2002. (*Id.*)

The case then moved on to the U.S. District Court for the Southern District of Texas, which has resulted in the current proceedings.[33]

### D. The Deportation of José Oscar Cervantes Valle (Clearly Someone Other Than Respondent)

It is noteworthy that, in the midst of the aforementioned events, a Mexican individual by the name of José Oscar Cervantes Valle (not to be confused with Respondent) was arrested for a narcotics-related matter in Bexar County.[34] (*See* Docket Entry #57, Exhibit "Q".) José Oscar Cervantes Valle, whose address is "Calle Cadimas

712, Nuevo Laredo, TAMPS, Mexico", was returned to Mexico by the INS on or about May 3, 2000.[35] (*Id.*) The record contains copies of photographs of José Oscar Cervantes Valle, and it is readily-apparent that he is not the same individual as the Respondent who is currently before this court. (*Id.*)

### E. The Extradition Proceedings Against Respondent in the United States District Court

The U.S. Attorney, acting on behalf of the government of Mexico, filed its complaint on February 21, 2002, thereby initiating the current litigation in the U.S. District Court. (Docket Entry #1.) The case was immediately referred to the undersigned.[36] An arrest warrant issued on the same date. (Docket Entry #2.)

The next day, on February 22, 2002, Respondent appeared before U.S. Magistrate Judge Felix Recio. (*See* Docket Entry #3.) The Federal Public Defender was then appointed to represent Respondent. (Docket Entry #5.) Respondent's commitment was ordered by Judge Recio on February 22, 2002. (Docket Entry #6.)

Respondent's first hearing before the undersigned occurred on February 27, 2002. (*See* Docket Entry #8.) Subsequently, on March 4, 2002, the government filed its "MOTION TO DETAIN RESPONDENT PURSUANT TO 18 U.S.C. § 3184." (Docket Entry #10.) A second hearing before the undersigned then occurred on March 6, 2002, at which time Respondent sought release on bond. (*See* Docket Entry #11.)

---

**33.** The court notes that, during the course of the extradition proceedings in this court, Respondent was granted permanent legal residency in the U.S. (*See* Docket Entry #62.)

**34.** José Oscar Cervantes Valle is 5′ 8″ in height, and was born on February 3, 1970.

**35.** Of course, his name and address match those of the gunman wanted in San Luis Potosí. (*See* Docket Entry #37, Exhibit "A", at Tab #30.)

**36.** This fact is indicated by the docket records maintained by the U.S. District Clerk.

The government filed its "PRE–HEARING EXTRADITION MEMORANDUM" on March 26, 2002. (Docket Entry # 14.) Afterward, on April 1, 2002, the case was re-assigned to U.S. District Judge Randy Crane.[37] Judge Crane then transferred this case back to the undersigned, by order signed on April 23, 2002. (Docket Entry # 15.)

On May 6, 2002, the government filed its "MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DETAIN RESPONDENT PURSUANT TO 18 U.S.C. § 3184." (Docket Entry # 17.) The "FORMAL EXTRADITION REQUEST" was also filed on May 6, 2002. (Docket Entry # 18.) Once the formal extradition request had been filed, the undersigned issued her "MEMORANDUM & ORDER" on May 13, 2002, pursuant to which Respondent was released on an unsecured bond. (Docket Entry # 22.)

The government sought to overturn and/or stay the undersigned's order releasing Respondent on an unsecured bond. (Docket Entry # 23.) That effort was dismissed by Judge Crane on May 17, 2002. (Docket Entry # 25.) The appearance bond and related order were then signed on May 17, 2002. (Docket Entry # 26.)

A hearing was convened on August 5, 2002, at which time a date for the extradition hearing was set. (See Docket Entry # 27.) The government then filed its "MOTION TO EXCLUDE ALIBI DEFENSE AT EXTRADITION HEARING" on August 19, 2002. (Docket Entry # 28.) Respondent's "ANSWER TO GOVERNMENT'S MOTION TO EXCLUDE ALIBI DEFENSE AT EXTRADITION HEARING" was filed on September 5, 2002. (Docket Entry # 33.)

The extradition hearing, which spanned part of two days, commenced before the undersigned on September 9, 2002. (See Docket Entry # 35.) Respondent called nine (9) witnesses to testify at the hearing, most of whom were his relatives and/or friends from Mexico. (See generally Docket Entry # 35.) The government called one (1) witness—a Mexican governmental official. (See generally id.)

Worthy of particular mention was the testimony given by Shelley Strayer. (See Transcription of Extradition Hearing of September 9, 2002, at pages 27–36.) Strayer, who is an investigator with the Laredo, Texas, office of the Federal Public Defender, followed up on the Nuevo Laredo, Tamaulipas, Mexico, address for the gunman which appears in the Mexican prosecution file.[38] (Id.) Her testimony is summarized as follows:

● On August 29, 2002, Strayer and another investigator with the Laredo, Texas, office of the Federal Public Defender, by the name of Ramiro Soto, traveled to "712 Cadimas in Nuevo Laredo, Mexico" ("Cadimas 712") (See Transcription of Extradition Hearing of September 9, 2002, at pages 28–29.) Upon arriving at Cadimas 712, Strayer and Soto spoke with the housekeeper, who is "a lady by the name of Aracelia." (Id., at page 29.) Aracelia revealed that Cadimas 712 is owned by José Antonio Cervantes Rodríguez ("Cervantes–Rodríguez"), and that Cervantes–Rodríguez has a son named José Oscar Cervantes Valle. (Id.) Strayer was unable to speak to Cervantes–Rodríguez at that time, as he was "unavailable." (Id.)

---

**37.** This fact is indicated by the docket records maintained by the U.S. District Clerk.

**38.** As previously noted in this memorandum, that address is as follows: Calle Cadimas 712, Fraccionamiento Residencial Viveros, Nuevo Laredo, Tamaulipas, Mexico. (Docket Entry # 37, Exhibit "A", at Tab # 30.)

• Subsequent to visiting Cadimas 712, Strayer had telephone conversations with Cervantes–Rodríguez on September 2, 2002, and September 7, 2002. (*See* Transcription of Extradition Hearing of September 9, 2002, at page 29.) In those conversations, Cervantes–Rodríguez confirmed that he has a son from his first marriage named José Oscar Cervantes Valle, and that José Oscar Cervantes Valle resides in the United States. (*Id.*, at page 30.) Cervantes–Rodríguez stated to Strayer that José Oscar Cervantes Valle was probably born in 1977 or 1978. (*Id.*) Cervantes–Rodríguez indicated ignorance of the current whereabouts of José Oscar Cervantes Valle. (*Id.*) In fact, Cervantes–Rodríguez stated that he had not seen José Oscar Cervantes Valle in about ten years. (*Id.*, at page 35.)

• Strayer consulted the 2000–2001 edition of the Nuevo Laredo telephone directory and determined that Cervantes–Rodríguez has a listing therein for Cadimas 712.[39] (*See* Transcription of Extradition Hearing of September 9, 2002, at pages 28–29; *see also* Docket Entry # 36, Exhibit "H"; Docket Entry # 37, Exhibit "A", at Tab # 30.)

• While in Nuevo Laredo, Strayer had photographed the exterior of Cadimas 712. (*See* Transcription of Extradition Hearing of September 9, 2002, at pages 30–31; *see also* Docket Entry # 36, Exhibits "E", "F", "G".) The mailbox bears the family name of "Cervantes Alonso."[40] (*See* Transcription of Extradition Hearing of September 9, 2002, at page 31; *see also* Docket Entry # 36, Exhibit "G".)

It is also noteworthy that all of the evidence adduced at the hearing indicates that Cervantes–Rodríguez is not the same gentleman as the one who credibly testified as Respondent's father at the hearing in this court on September 9, 2002.[41] (*See* Transcription of Extradition Hearing of September 9, 2002, at pages 10–27.) Further, the court notes that Respondent's mother's paternal surname is González.[42] (See *id.*)

The second day of the extradition hearing occurred on September 10, 2002, at which time closing arguments were presented. (*See, e.g.,* Docket Entry # 38.) After the hearing, Respondent was ordered to brief the court concerning the admissibility of the documents which he had tendered to the court. (Docket Entry # 39.) The government, for its part, was ordered to brief the court concerning the time limits for prosecuting the underlying offenses. (Docket Entry # 40.)

Respondent filed his "MEMORANDUM OF LAW IN SUPPORT OF ADMISSIBILITY OF RESPONDENT'S EXHIBITS" on September 17, 2002. (Docket Entry # 41.) The government replied thereto on September 23, 2002. (Docket Entry # 43.) The government filed its "TIME LIMITATIONS BRIEF FOR PROSECUTING OFFENSES COVERED BY THE MEXICAN EXTRADITION TREATY" on October 15, 2002. (Docket Entries # 45, 50.) Two days la-

---

**39.** The court additionally notes that, as of March 11, 2003, the address obtainable online, *via www.seccionamarilla.com.mx,* for Cervantes–Rodríguez is "CADIMAS 712 COL RES VIVEROS NVO LDO TAM."

**40.** Accordingly, the court extrapolates that Cervantes–Rodríguez's current wife's paternal surname is Alonso.

**41.** The complete name of Respondent's father is José Cervantes Dávalos. (*See* Docket Entry # 35.)

**42.** Her complete name is Sylvia González de Cervantes. (*See* Docket Entry # 35.) The implication, then, is that the couple who testified in court on September 9, 2002, as Respondent's parents, is not the same couple which resides at Cadimas 712.

ter, on October 17, 2002, the government filed its "SUPPLEMENTATION TO GOVERNMENT EXHIBIT 1 ON TIME LIMITATIONS BRIEF FOR PROSECUTION OFFENSES COVERED BY THE MEXICAN EXTRADITION TREATY." (Docket Entry # 51.)

On November 20, 2002, Respondent sought a continuance in order to obtain exculpatory information from the INS. (Docket Entry # 55.) The continuance was granted. (Docket Entry # 56.) On December 27, 2002, Respondent filed information obtained from the INS concerning José Oscar Cervantes Valle. (Docket Entry # 57.)

To say the least, the new information filed by Respondent was startling. (*See* Docket Entry # 57.) The INS documentation, filed by Respondent, includes copies of photographs of José Oscar Cervantes Valle, who lives at Cadimas 712, and who was returned to Mexico by the INS, and makes clear that Respondent is not José Oscar Cervantes Valle (*i.e.*, the individual suspected to be the gunman in the killing of Guillermo Colorado Saavedra). (*See* Docket Entry # 57.) Nevertheless, the Mexican government apparently insists that such matters be resolved in Mexican tribunals and not in this court. (Electronic Recording of Hearing of March 7, 2003; *see* Docket Entry # 62.)

At this point, the undersigned has thoroughly reviewed the record in this case, as well as the legal and policy considerations relevant thereto, and determines that this case is ripe for final disposition.

### III. Analysis

■ From the outset, the court bears in mind that extradition is *sui generis* in nature, neither civil nor criminal. *See Extradition of Massieu*, 897 F.Supp. 176, 177 (D.N.J.1995) (concerning Mexican extradition request). Restated somewhat differently, it has been noted that each separate extradition treaty between the United States and a foreign nation is *sui generis*, and as a contract between two sovereigns, sets forth its own law. *See Extradition of Nacif-Borge*, 829 F.Supp. 1210, 1213 (D.Nev.1993) (concerning Mexican extradition request). Following the United States–Mexico treaty, the court will address (a) whether the charged offenses are covered by the extradition treaty, and (b) whether the evidence justifies commitment for trial. *See* 31 U.S.T. 5059, arts. 2, 3.

### A. Are the charged offenses covered by the extradition treaty?

■ According to the principle of dual criminality, the act on which the extradition request is founded must be considered a crime in both jurisdictions. *See, e.g., Extradition of Diaz Medina*, 210 F.Supp.2d 813, 816 (N.D.Tex.2002) (concerning Mexican extradition request); *Extradition of Garcia*, 890 F.Supp. 914, 919 (S.D.Cal.1994) (concerning Mexican extradition request). Pursuant to Article 2 of the extradition treaty, the offenses for which the government of Mexico seeks to prosecute must be punishable in both the United States and Mexico by deprivation of liberty, the maximum of which shall not be less than one year. 31 U.S.T. 5059, art. 2. Of course, the determination of whether a crime is within the provisions of an extradition treaty is within the sole purview of the requested country. *See, e.g., Extradition of Valdez–Mainero*, 3 F.Supp.2d 1112, 1115 (S.D.Cal.1998) (concerning Mexican extradition request). The court has therefore considered whether the dual criminality requirement is satisfied for *homicidio, homicidio en grado de tentativa,* and *asociación delictuosa.*

Based on the discussion below, the court concludes that the dual criminality requirement is indeed satisfied. *See* 31 U.S.T. 5059, art. 2.

### 1. Homicidio

■ The offense of murder is included within the appendix to the extradition treaty; thus, following Article 2, § 1, of the treaty, it is an extraditable offense if punishable in both countries by deprivation of liberty the maximum of which shall not be less than one year. 31 U.S.T. 5059, art. 2. Pursuant to *Artículo* 294 of the *Código Penal* for the State of San Luis Potosí, murder is punishable by deprivation of liberty the maximum of which is twenty (20) years. (*See* Docket Entry # 51.) Pursuant to sections 12.32 and 19.02 of the Texas Penal Code, murder is punishable in this jurisdiction by deprivation of liberty the maximum of which is life or ninety-nine (99) years. Based on the foregoing, the court concludes that *homicidio* is an extraditable offense under the treaty. *See* 31 U.S.T. 5059, art. 2.

### 2. Homicidio en Grado de Tentativa

■ Following Article 2, §§ 1, 4(a), of the treaty, attempted murder is an extraditable offense if punishable in both countries by deprivation of liberty the maximum of which shall not be less than one year. 31 U.S.T. 5059, art. 2. Pursuant to *Artículo* 78 and *Artículo* 294 of the *Código Penal* for the State of San Luis Potosí, attempted murder is punishable by deprivation of liberty the maximum of which is 13.33 years. (*See* Docket Entry # 51.) Pursuant to sections 12.33(a), 15.01(d), and 19.02 and of the Texas Penal Code, attempted murder is punishable in this jurisdiction by deprivation of liberty the maximum of which is twenty (20) years. Based on the foregoing, the court concludes that *homicidio en grado de tentativa* is an extraditable offense under the treaty. *See* 31 U.S.T. 5059, art. 2.

### 3. Asociación Delictuosa

■ Following Article 2, §§ 1, 4(a), of the treaty, criminal association is an extraditable offense if punishable in both countries by deprivation of liberty the maximum of which shall not be less than one year.[43] 31 U.S.T. 5059, art. 2. Pursuant to *Artículo* 224 and *Artículo* 225 of the *Código Penal* for the State of San Luis Potosí, criminal association is punishable by deprivation of liberty the maximum of which is eight (8) years. (*See* Docket Entry # 51.) The court determines that the best-fitting analog to *Artículo* 224 of the *Código Penal* for the State of San Luis Potosí is the offense of engaging in organized criminal activity, which is addressed by section 71.02 of the Texas Penal Code; thus, it must be noted that, pursuant to sections 12.32(a), 19.02 and 71.02 of the Texas Penal Code, engaging in organized criminal activity is punishable in this jurisdiction by deprivation of liberty the maximum of which is life or ninety-nine (99) years. Based on the foregoing, the court concludes that *asociación delictuosa* is an extraditable offense under the treaty. *See* 31 U.S.T. 5059, art. 2.

### B. Does the evidence justify commitment for trial?

■ In accordance with Article 3 of the treaty, the court may grant the extradition request only if the evidence is found sufficient, under the laws of the United States, to justify the committal for trial. 31 U.S.T. 5059, art. 3. Thus, in the current proceedings under 18 U.S.C. § 3184, the court is charged with inquiring whether the evidence will sustain the charges. *See, e.g., Extradition of Wise,* 168 F.Supp. 366, 372 (S.D.Tex.1957) (regarding Mexican extradition request). In the United States,

---

**43.** For the present analysis, the court regards criminal association as the participation in the execution of the underlying offense (which in the present case consists of murder and attempted murder).

evidence that is sufficient to sustain the charges requires a showing of probable cause. *Extradition of Diaz Medina*, 210 F.Supp.2d at 816; *see, e.g., Extradition of Contreras*, 800 F.Supp. 1462, 1464 (S.D.Tex.1992) (regarding Mexican extradition request).

■ Probable cause is the existence of reasonable grounds to believe the accused committed the offense charged. *See Extradition of Diaz Medina*, 210 F.Supp.2d at 817. This term signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. *See, e.g., Extradition of Rodriguez*, 1995 WL 312099, *2 (N.D.Cal. May 17, 1995) (regarding Mexican extradition request). *See also* Bruce Zagaris and Julia Padierna Peralta, *Mexico–United States Extradition and Alternatives: from Fugitive Slaves to Drug Traffickers—150 Years and Beyond the Rio Grande's Winding Course*, 12 *Am. U.J. Int'l L. & Pol'y* 519, 570 (1997). Given these analytical constructs, the extradition case is subject to certain evidentiary requirements the precise interpretation of which is oftentimes rather thorny. *See generally* Ann Powers, *Justice Denied? The Adjudications of Extradition Applications*, 37 *Tex. Int'l L.J.* 277 (2002).

■ It must be noted that the probable cause hearing is akin to a preliminary hearing, and not to determine whether the accused is guilty or innocent. *Extradition of Contreras*, 800 F.Supp. at 1464. At the hearing, the rules of evidence and of criminal procedure do not apply, which, procedurally, appears to make for a broad hearing. *Id.* Substantively, however, the scope of the hearing is very limited as to matters raised by Respondent. *See id.*

■ Evidence explaining away or completely rebutting the existence of probable cause appears to be the only admissible evidence which Respondent can present. *Extradition of Contreras*, 800 F.Supp. at 1464. If Respondent's evidence merely controverts the government's probable cause evidence, then it is to be excluded. *See id.* Respondent's evidence of an alibi defense is therefore admissible if it negates or obliterates probable cause. *See, e.g., Extradition of Gonzalez*, 52 F.Supp.2d 725, 739 (W.D.La.1999) (concerning Mexican extradition request).

■ Stated differently: As a general rule, international extradition proceedings in the United States are governed by the evidentiary rule that the accused has no right to present a defense to the charges against him, such as an alibi defense, and has no right to introduce evidence which merely contradicts the demanding country's proof, or which only poses conflicts of credibility. *See* Jacques Semmelman, *The Rule of Non–Contradiction in International Extradition Proceedings: a Proposed Approach to the Admission of Exculpatory Evidence*, 23 *Fordham Int'l L.J.* 1295, 1296 (2000). Hence, the general rule of non-contradiction in this context permits the accused to introduce evidence of very limited scope. *Id.* at 1297. Following the general rule of non-contradiction, the accused may only introduce evidence that "explains" the government's evidence. *Id.*

Explanatory evidence, then, is taken to mean evidence that provides an innocent explanation for the matters which the government contends point toward guilt. *Id.* Yet, to the extent that the government relies upon circumstantial evidence, the accused is generally permitted to introduce evidence that helps explain it away. *Id.* To be sure, the division between what is admissible evidence in the extradition context and that which is not admissible is difficult to perceive in a wide range of possible evidentiary scenarios.

In deciding whether probable cause supports the extradition request in the case at bar, the court first examines the issue of Respondent's identification by eyewitnesses to the crime, since that evidence would, at first blush, seem to be most compelling. After reviewing the eyewitness identifications, the court will next turn its attention to the remainder of the evidence in the record and its implications for the overall probable cause analysis which this court must undertake. Based on this review, the court draws its conclusion regarding whether probable cause supports the extradition request. *See* 31 U.S.T. 5059, art. 3.

### 1. *Eyewitness Identification*

■ The government of Mexico has an affirmative obligation to properly identify the person being sought for extradition. *See Extradition of Gonzalez,* 52 F.Supp.2d at 737. In the case at bar, the evidence on which the Mexican government relies mainly consists of testimony and statements from eyewitnesses to the murder of Guillermo Colorado Saavedra. (*See generally* Docket Entry # 37, Exhibit "A.") Such evidence, however, must be able to withstand scrutiny from various angles.

■ It seems to be a settled principle that the accused may raise the issue of his identity in an extradition hearing. *See, e.g.,* W.C. Crais III, Annotation, *Necessity and sufficiency of identification of accused as the person charged, to warrant extradition,* 93 *A.L.R.2d* 912, 1964 WL 12983, § 2 (1964). Of course, the presiding magistrate has the right and duty to determine whether the person arrested is the one named in the complaint. *See* 31A *Am.Jur.2d Extradition* § 103. In the interests of justice, therefore, this court has thoroughly reviewed the matters relating to the identification of Respondent by eyewitnesses.

■ The court is mindful that there exists no rule specifying which identification procedures are competent for use in extradition proceedings, and such evidence need not be rejected merely because United States procedures governing the admissibility of an identification at trial were not followed.[44] *See* 31A *Am.Jur.2d Extradition* § 104. Inherent in the probable cause standard for extradition proceedings is the necessity of a determination that the evidence is both sufficiently reliable and of sufficient weight to warrant a given conclusion. *Id.* Hence, it is also borne in mind that in the domestic law enforcement context an ordinary citizen's eyewitness account of criminal activity and identification of a perpetrator is normally regarded as sufficient to supply probable cause. *See generally United States v. Burbridge,* 252 F.3d 775, 778 (5th Cir.2001).

■ The court is keen to keep an open mind with respect to the possibility of misidentification by the eyewitnesses, given the fact that both the psychological and legal communities have recognized that there are, in general, well-known flaws with eyewitness identification evidence. *See generally* Jennifer L. Devenport, Steven D. Penrod, and Brian L. Cutler, *Eyewitness Identification Evidence: Evaluating Commonsense Evaluations,* 3 *Psychol. Pub. Pol'y & L.* 338, 339 (1997). Thus, a two-step analysis is employed herein to determine whether the government's identification evidence ought to be admitted. *Burbridge,* 252 F.3d at 780. First, the court determines whether the identification procedures were impermissibly suggestive. *Id.* Second, if the procedures were impermissibly suggestive, the court

---

**44.** This point is important to remember, because, among other things, the identification procedures used by the investigative authorities in San Luis Potosí differed from practices encouraged in the United States.

must determine whether, under the totality of the circumstances, the suggestiveness led to a substantial likelihood of irreparable misidentification. *Id.*

■ The reader will recall that the seven-photograph lineup used by the authorities in Mexico contained two photographs of Respondent. (*See* Docket Entry # 37, Exhibit "B".) That fact, standing alone, contravenes the best practices which law enforcement personnel are encouraged, by the Department of Justice, to observe. *See generally* U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Eyewitness Evidence: A Guide for Law Enforcement,* at page 29 (October 1999). The court is convinced that the identification procedures employed in Mexico, recited herein and taken in their totality, were impermissibly suggestive.

■ Since the eyewitness identification procedures were impermissibly suggestive, the court must now determine whether, under the totality of the circumstances, the suggestiveness led to a substantial likelihood of irreparable misidentification by the eyewitnesses, which in turn requires the court to apply the criteria set forth by the Supreme Court of the United States in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). *See Burbridge,* 252 F.3d at 780. The factors to be considered in evaluating the likelihood of misidentification include the following:

- the opportunity of the witness to view the criminal at the time of the crime,
- the degree of attention paid by the witness,
- the accuracy of the prior description of the criminal given by the witness,
- the level of certainty demonstrated by the witness at the confrontation, and
- the length of time between the crime and the confrontation.

*Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Applying the *Neil* factors to the situation at bar, the BIA found that the eyewitness identifications in the case at bar are unreliable. (*See* Docket Entry # 12, Exhibit "D", at pages 6–7.)

That legal conclusion is, nonetheless, potentially distinguishable, because when the BIA reviewed the case, it did so without the benefit of prior eyewitness descriptions of the perpetrator. (*See* Docket Entry # 12, Exhibit "D", at page 6.) Owing to the more formal nature of extradition proceedings, this court has, on the other hand, had the opportunity to review the accuracy of the prior description of the criminal given by the eyewitnesses, the details of which were previously recited in this memorandum. In so doing, the court observes some degree of consistency in the eyewitness descriptions, at least insofar as the age and height of the perpetrator are concerned.

In the case at bar, the moderate level of consistency of the prior descriptions of the criminal given by the eyewitnesses could potentially serve as a counterweight to the suggestive identification techniques employed in Mexico. Under the totality of the circumstances (and given the fact that Respondent has obliterated the probable cause evidence, as discussed herein), however, that suggestiveness indeed led to a substantial likelihood of irreparable misidentification by the eyewitnesses.

### 2. Remainder of the Evidence

■ Respondent has advanced a number of factual matters which all seem to be in the nature of an alibi and/or defenses, the main thrust of which is Respondent's contention that this is a case of mistaken identity. The court, having reviewed the INS file relating to the actual Cervantes–Valles who lives at Cadimas 712, and having compared the photos of Cervantes–Valles to the gentleman observed in court,

is overwhelmingly convinced that Respondent is correct in asserting that he is not the person sought by the Mexican government. (*See* Docket Entry # 57.) This is a textbook case of mistaken identity, and the governments of the U.S. and Mexico, in the interests of justice, ought to have conceded that fact. To be clear, the court finds and concludes and Respondent has totally negated and obliterated the probable cause evidence advanced on behalf of the Mexican government.

### IV. Certificate of Non–Extraditability

Having determined that the evidence proffered by the United Mexican States is insufficient, according to the laws of the United States, to justify committal for trial, the extradition request must be in all things DENIED. 31 U.S.T. 5059, arts. 3, 14.

### V. Notice

The court clerk shall deliver a copy of this memorandum to counsel by any receipted means. The court clerk shall also send a copy of this memorandum *via* certified mail (return receipt) to:

- Colin L. Powell, Secretary of State, 2201 C. Street, NW, Washington, D.C. 20520; and

- Ambassador Juan José Bremer Martino, Embassy of Mexico, 1911 Pennsylvania Avenue NW, Washington, D.C. 20006.