**Michael AUSTIN, Petitioner–Appellant,**

v.

**Charles HEALEY, United States Marshal for the Eastern District of New York, Respondent–Appellee.**

**No. 1996, Docket 93–2308.**

United States Court of Appeals, Second Circuit.

Argued July 14, 1993.

Decided Sept. 21, 1993.

Victoria Toensing, Washington, DC (Joseph E. diGenova, Steven L. Zelinger, Suzanne M. Dohrer, Manatt, Phelps & Phillips, Washington, DC, of counsel), for petitioner-appellant.

Charles E. Rose, Asst. U.S. Atty., E.D.N.Y. (Barbara Underwood, Chief Asst. U.S. Atty., E.D.N.Y., Peter A. Norling, David C. James, Asst. U.S. Attys., of counsel), for respondent-appellee.

Before: MAHONEY, McLAUGHLIN and JACOBS, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Petitioner Michael Austin appeals from a judgment entered in the United States District Court for the Eastern District of New York (Edward R. Korman, *J.*) denying his petition for a writ of habeas corpus. By his petition, Austin sought review of the order of the extradition magistrate (Zachary M. Carter, *M.J.*) certifying his extraditability to the United Kingdom to face murder charges.

In this appeal, Austin's principal challenge is to the jurisdiction of the extradition magistrate. He attacks a local court rule that automatically assigns extradition proceedings to magistrate judges. Austin reads the extradition statute, 18 U.S.C. § 3184 (Supp. 1992), to require that an Article III judge *personally* assign a magistrate to a *particular* extradition matter, and thereafter retain supervisory authority over the case. Alternatively, he argues that the automatic designation of magistrates to conduct extradition proceedings violates Article III of the Constitution.

Finding no infirmity in the procedure of the district court, or in the proceedings below, we affirm.

## BACKGROUND

On March 5, 1992, two unidentified assailants assassinated David George Wilson, a British accountant and commodities broker, in his garage in Lancashire, England. According to British authorities, Wilson's murder stemmed from his involvement with Austin and others in an international investment fraud scheme. At the extradition hearing, the government provided the following account of the events leading up to the British government's request for Austin's extradition.

Posing as a Mexican Army colonel, Austin represented that he had influence with the Mexican government and had access to a large supply of Marlboro cigarettes manufactured in Mexico. Austin engaged Wilson to line up European investors for the cigarettes, which were to be shipped from the United States. The investors were asked to open letters of credit in Austin's favor when the ship set sail for Europe. The cigarettes, however, never existed; Austin's plan was to have the ship scuttled while at sea and to abscond with the investors' money.

Repeated shipping delays made some investors suspicious and they asked the Dutch and British authorities to investigate Austin. Upon information provided by the Dutch, the British arrested Wilson and questioned him

about his role in the scam. After he was released, Wilson admitted to Austin that he was cooperating with the police.

His plan unraveling, Austin decided that Wilson knew too much and had to be eliminated. By telephone and fax from his office in New York City, Austin arranged for extensive surveillance of Wilson in the days immediately preceding the killing. Austin also told other business associates that he intended to hire assassins to kill Wilson because Wilson owed him money and because Wilson was cooperating with the police. After Wilson's murder, Austin became a suspect in the murder investigation in England.

On April 1, 1992, the Magistrate's Court at Lancashire issued a warrant for Austin's arrest on the charge of conspiracy to murder Wilson.[1] Because Austin was still in the United States, the United Kingdom requested Austin's provisional arrest by diplomatic note to the State Department for purposes of extradition. On behalf of the British government, the United States Marshal filed a complaint in the Eastern District seeking Austin's provisional arrest.

Pursuant to an Eastern District local court rule, the matter of Austin's extradition was assigned directly to a magistrate judge. *See* Rule 9 of the Rules for Magistrate Judges, United States District Courts for the Eastern and Southern Districts of New York ("Rule 9").[2] Based upon the Marshal's complaint, the diplomatic note and the British arrest warrant, Magistrate Judge A. Simon Chrein issued the provisional arrest warrant on April 3, 1992. Austin was then arrested in New York City on July 15, 1992.

The following January, an extradition hearing was conducted before Magistrate Judge Zachary W. Carter (the "extradition magistrate"). Relying primarily upon documents and affidavits from England, the extradition magistrate concluded that there was probable cause to believe Austin committed the crimes charged. Accordingly, in an order dated January 29, 1993, he certified

Austin's extraditability to the United Kingdom.

On March 2, 1993, Austin filed the present petition for a writ of habeas corpus in the district court, challenging the order of extraditability. Austin argued that: (1) the admission of multiple layers of hearsay during the extradition hearing violated the Due Process Clause and the extradition treaty; (2) the evidence was insufficient to support a finding of probable cause; and (3) the extradition magistrate erred when he denied certain requests for discovery. Notably, Austin did not attack Rule 9. In a written decision, the district court rejected each of Austin's three contentions and denied Austin's petition.

Austin now appeals.

## DISCUSSION

"Extradition is the process by which a person charged with or convicted of a crime under the law of one state is arrested in another state and returned for trial and punishment." *Restatement (Third) of the Foreign Relations Law of the United States* § 474, at 556–57 (1987). Extradition is primarily a function of the executive branch, and the judiciary has no greater role than that mandated by the Constitution, or granted to the judiciary by Congress. *See Martin v. Warden, Atlanta Pen,* 993 F.2d 824, 828–29 (11th Cir.1993).

■ Accordingly, on appeal from the denial of habeas corpus in extradition proceedings, the scope of our review is quite limited. We consider only: (1) whether the judicial officer who conducted the extradition proceedings had jurisdiction; (2) whether the offense charged is extraditable under the terms of the treaty; and (3) whether there was sufficient evidence to support the finding of probable cause to extradite. *See Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925); *Ahmad v. Wigen,* 910 F.2d 1063, 1064 (2d Cir.1990).

---

1. On August 27, 1992, the Magistrate's Court issued a second arrest warrant, adding the substantive crime of murder.

2. Rule 9 provides: "Pursuant to 18 U.S.C. Sec. 3184 magistrates are empowered to issue warrants for the apprehension of persons and conduct hearings and consider the evidence in the extradition proceedings referred to therein."

Austin concedes that murder and conspiracy to murder are extraditable offenses under the treaty. Accordingly, we address only the magistrate's jurisdiction and the sufficiency of the evidence.

## I. Jurisdiction of the Extradition Magistrate

Austin's primary argument on appeal is that the extradition magistrate lacked jurisdiction. In support of this position, Austin contends that: (1) Rule 9's automatic designation of magistrate judges to conduct extradition proceedings contravenes the relevant extradition statute, 18 U.S.C. § 3184; and (2) Rule 9's automatic designation violates Article III of the Constitution. Because he now believes that these too affect jurisdiction, he adds claims that: (3) the Marshal's complaint failed to adequately apprise Austin of the charges against him; and (4) there was no probable cause to support his provisional arrest.

At the outset, we emphasize that Austin raises his four "jurisdictional" arguments for the first time in this appeal, despite the general rule that "a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). Because this rule is one of prudence (and does not limit our jurisdiction), however, we retain considerable discretion to decide questions not raised initially in the district court. *See Lavoie v. Pacific Press & Shear Co.*, 975 F.2d 48, 56 (2d Cir.1992).

■ We see no reason to depart from the general rule of forfeiture with respect to Austin's third argument that the complaint was inadequate and his fourth, that his provisional arrest was illegal. Although he stipples his briefs with references to "subject matter jurisdiction," neither claim affects the extradition court's jurisdiction, *see In re Adutt*, 55 F. 376, 379 (C.C.Ill.1893) (defect in extradition complaint is "not a matter going to the jurisdiction of the [magistrate] to entertain the complaint"); *Sewell v. United States*, 406 F.2d 1289, 1292 (8th Cir.1969) (challenge to arrest without probable cause was waivable defect going only to personal jurisdiction), which is conferred by section 3184 and Rule 9. *See In re Demjanjuk*, 603 F.Supp. 1468, 1469 (N.D. Ohio), *appeal dismissed*, 762 F.2d 1012 (6th Cir.1985); *In re Extradition of Singh*, 1988 WL 151438 (D.N.J. Feb. 17, 1988). Accordingly, we decline to consider them at this late hour. *See Jhirad v. Ferrandina*, 536 F.2d 478, 486 (2d Cir.) ("Non-jurisdictional objections must, of course, be timely raised or they are waived."), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976).

■ We distinguish, however, Austin's first and second contentions, his statutory and constitutional challenges. These claims raise purely legal issues, *see, e.g., Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 n. 5 (D.C.Cir.1992), the resolution of which may affect "the proper administration of judicial business." *Glidden Co. v. Zdanok*, 370 U.S. 530, 536, 82 S.Ct. 1459, 1465, 8 L.Ed.2d 671 (1962) (plurality opinion). Moreover, because Austin's second claim, the constitutional argument, implicates the balance struck by our Constitution among the three branches of government, notions of forfeiture or waiver "cannot be dispositive." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851, 106 S.Ct. 3245, 3256, 92 L.Ed.2d 675 (1986). Accordingly, we will exercise our discretion to address these two questions, despite Austin's failure to raise them in the district court.

### A. Rule 9 and the Extradition Statute

■ Austin argues that Rule 9's automatic relegation of extradition to a magistrate judge contravenes 18 U.S.C. § 3184. Section 3184 provides that magistrates may conduct extradition proceedings if "authorized so to do by a court of the United States." Austin reads this statutory language [3] to require a

---

3. In relevant part, the statute reads:

Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within

*specific* delegation of authority to a magistrate by a district judge for each extradition matter. Accordingly, Austin maintains, Rule 9's omnibus designation violates the statute. We find it incomprehensible that if a statute authorizes a court to delegate responsibility, it cannot do so as a corporate body (by rule) and must act only through individual judges on a case-by-case basis.

Austin directs our attention to the Federal Magistrates Act. Even though "extradition" is not expressly referred to in the Act, Austin posits that an extradition proceeding is a "hearing" authorized under section 636(b)(1)(B) of the Act. 28 U.S.C. § 636(b)(1)(B) (1988). That section, Austin continues, requires a special delegation of authority to a magistrate, and provides for *de novo* review by the district judge. We reject Austin's statutory argument for two reasons.

Section 3184 speaks of authorization by a "court." 28 U.S.C. § 636(b)(1)(B), by contrast, refers to designation by "a judge." Hence, on its face section 3184 does not support a requirement of special delegation. *See Ward v. Rutherford*, 921 F.2d 286 (D.C.Cir.1990) (by its "plain meaning," similar D.C. local court rule provided the "authoriz[ation]" contemplated by section 3184), *cert. dismissed,* —— U.S. ——, 111 S.Ct. 2844, 115 L.Ed.2d 1013 (1991). *Cf. Grin v. Shine*, 187 U.S. 181, 186, 23 S.Ct. 98, 100, 47 L.Ed. 130 (1902) ("we are not bound to import words into [section 3184] which are not found there").

Nor does the Federal Magistrates Act support Austin's argument. Section 636(a) of that Act expressly bestows upon magistrates "all powers and duties conferred or imposed upon United States commissioners." 28 U.S.C. § 636(a). And, prior to the Act, extradition proceedings were conducted by commissioners. *See* Pub.L. No. 90–578, § 301(a), 82 Stat. 1108 (1968) (substituting "magistrate" for "commissioner" in section 3184). Historically, it was never required that a commissioner be appointed in a particular extradition case, so long as he was ap-

pointed "in all cases of extradition." *In re Farez*, 8 Fed.Cas. 1007, 1008 (C.C.S.D.N.Y. 1870) (No. 4645). *See* 1 John Bassett Moore, *Moore on Extradition* 448–49 (1891). This is not without significance. We find nothing in the Federal Magistrates Act that changed this longstanding convention.

### B. *Article III*

■ Austin's next argument plunges us into the "constitutional quandary" that is Article III. *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 112, 102 S.Ct. 2858, 2892, 73 L.Ed.2d 598 (1982) (White, J., dissenting). Article III nourishes two intersecting values in our constitutional system: first, it protects the institutional integrity of the judiciary by safeguarding its independence against encroachment by the political branches; second, it guarantees litigants the personal right to have their claims adjudicated by judges cloaked with that independence. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848, 106 S.Ct. 3245, 3255, 92 L.Ed.2d 675 (1986) (citations omitted).

Austin believes that section 3184, as implemented by Rule 9, both (1) infringes upon the institutional integrity of the judiciary, and (2) violates his personal right to adjudication before an Article III judge. According to Austin, "[t]he Constitution requires that a United States citizen who could be denied his liberty through extradition to a foreign country have his case heard by a judge imbued with the independent judicial power guaranteed by Article III." We do not agree that either the judiciary's institutional rights, or Austin's personal rights, are jeopardized when magistrates conduct extradition proceedings at the direction of an Article III court.

#### 1. *Institutional Interests*

We reject the notion that judicial independence is compromised when extradition hearings are conducted by magistrates authorized by rule of court. "Article III, § 1 safeguards

---

the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he

may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered. 18 U.S.C. § 3184.

the role of the Judicial Branch in our tripartite system by barring congressional attempts 'to transfer jurisdiction [to non-Article III tribunals] for the purpose of emasculating constitutional courts,' and thereby preventing 'the encroachment or aggrandizement of one branch at the expense of the other.' " *Schor,* 478 U.S. at 850, 106 S.Ct. at 3256 (brackets in *Schor*) (citations omitted). At the same time, however, we will not read Article III to "unduly constrict Congress' ability to take needed and innovative action pursuant to its Article I powers." *Id.* at 851, 106 S.Ct. at 3256.

Accordingly, when we evaluate a congressional delegation of authority to a non–Article III officer, we eschew "doctrinaire reliance on formal categories," *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 587, 105 S.Ct. 3325, 3336, 87 L.Ed.2d 409 (1985), and, instead, weigh a number of competing factors with the goal of preserving the values embodied in Article III:

> Among the factors upon which we have focused are the extent to which the "essential attributes of judicial power" are reserved to Article III courts, and conversely, the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts, the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from the requirements of Article III.

*Schor,* 478 U.S. at 851, 106 S.Ct. at 3256. Upon consideration of these factors, we conclude that a general authorization to magistrates of the authority to conduct extradition hearings does not violate Article III.

Extradition magistrates do not exercise powers traditionally "reserved to Article III courts." To the contrary, the function performed by the judicial officer in certifying extraditability has not historically been considered an exercise of the "judicial power of the United States" at all. *See In re Extradition of Howard,* 996 F.2d 1320, 1325 (1st Cir.1993) ("an officer who presides over such a proceeding is not exercising 'any part of the judicial power of the United States' ") (quoting *In re Kaine,* 55 U.S. (14 How.) 103, 119, 14 L.Ed. 345 (1852) (Curtis, J., concur-

ring)); *Ward,* 921 F.2d at 288 n. 2 ("Extradition, akin to a preliminary hearing, does not implicate 'the essential attributes of judicial power' and it certainly has not normally been vested *only* in Article III courts.") (emphasis in original); *Martin,* 993 F.2d at 828 ("An extradition proceeding is not an ordinary Article III case or controversy.").

The judicial officer conducting an extradition hearing is said to act in a "non-institutional capacity by virtue of a 'special authority,' " *Howard,* 996 F.2d at 1325 (quoting *In re Metzger,* 46 U.S. (5 How.) 176, 191, 12 L.Ed. 104 (1847)), an authority that has been delegated to the judiciary by Congress in section 3184. *See Martin,* 993 F.2d at 828. The function of the judicial officer is simply to certify extraditability to the Secretary of State, who holds the ultimate power to extradite at his discretion. *See United States v. Doherty,* 786 F.2d 491, 499 n. 10 (2d Cir. 1986). Indeed, as Judge Friendly explained in *In re Mackin,* 668 F.2d 122, 125–30 (2d Cir.1981), orders certifying extraditability are non-appealable precisely because they do not emanate from constitutional courts.

Neither do we consider the "origins and importance" of extradition hearings to weigh in Austin's favor. We have repeatedly noted, for example, that an extradition hearing is not a criminal prosecution: the order of extraditability expresses no judgment on Austin's guilt or innocence. *See, e.g., Melia v. United States,* 667 F.2d 300, 302 (2d Cir. 1981); *Simmons v. Braun,* 627 F.2d 635, 636 (2d Cir.1980); *Jhirad v. Ferrandina,* 536 F.2d 478, 482 (2d Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976). Rather, an extradition hearing is "of the character of those preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused . . . to ultimately answer to an indictment, or other proceeding, in which he shall be finally tried upon the charge made against him." *Benson v. McMahon,* 127 U.S. 457, 463, 8 S.Ct. 1240, 1243, 32 L.Ed. 234 (1888).

Finally, a brief review of the "concerns that drove Congress" in 1848 to grant judges and magistrates (then commissioners) their

current role in the extradition process demonstrates that Congress reacted, in part, to "the public clamor for judicial involvement in the extradition process." Jacques Semmelman, *Federal Courts, The Constitution, and the Rule of Non–Inquiry in International Extradition Proceedings,* 76 Cornell L.Rev. 1198, 1208 (1991). *See generally* 1 M. Cherif Bassiouni, *International Extradition* 51 (2d rev. ed. 1987) ("The 1848 Act was designed to limit executive power.... The underlying theory was that the judiciary should have the authority to review executive action so that fundamental individual liberty would not be improperly infringed."); *Mackin,* 668 F.2d at 134–35 (in which Judge Friendly chronicles how executive abuse of its nearly absolute discretion in extradition matters led Congress in 1848 to enact what is now section 3184). Thus, by section 3184, Congress interposed the judiciary between the executive and the individual.

The procedures challenged here adequately safeguard the integrity of the judicial branch. Magistrates are appointed and are subject to removal by Article III courts. 28 U.S.C. § 631(a) & (i) (1988). Section 3184 permits extradition proceedings by magistrates *only* after an Article III court has authorized them. 18 U.S.C. § 3184. Finally, and most significantly, Rule 9 was promulgated by Article III judges. Because the authority to designate magistrates to hear extradition matters remains exclusively *within* the judiciary, we see no potential for trespass by the executive: "Thus, the only conceivable danger of a 'threat' to the 'independence' of the magistrate comes from within, rather than without, the judicial department." *United States v. Raddatz,* 447 U.S. 667, 685, 100 S.Ct. 2406, 2417, 65 L.Ed.2d 424 (1980) (Blackmun, J., concurring).

### 2. *Personal Rights*

We also reject Austin's claim that his personal rights under Article III were violated. Although the contours of such a right are vague, it has been described as the "right to

have claims decided by judges who are free from potential domination by other branches of government." *United States v. Will,* 449 U.S. 200, 218, 101 S.Ct. 471, 482, 66 L.Ed.2d 392 (1980). Article III does not, however, "confer on litigants an absolute right to the plenary consideration of every nature of claim by an Article III court." *Schor,* 478 U.S. at 848, 106 S.Ct. at 3255. *See Palmore v. United States,* 411 U.S. 389, 407, 93 S.Ct. 1670, 1681, 36 L.Ed.2d 342 (1973).

As our discussion makes clear, section 3184, coupled with Rule 9's authorization procedure, does not leave room for unwelcome intrusion by the political branches into the extradition process. Although we agree that "extradition without an unbiased hearing before an independent judiciary [is] highly dangerous to liberty," *In re Kaine,* 55 U.S. (14 How.) 103, 112, 14 L.Ed. 345 (1852), embracing this sentiment does not require that we demand further safeguards to individual liberty than those already chosen by Congress and the judges of the Eastern District. *See* Samuel T. Spear, *The Law of Extradition* 270 (3rd ed. 1885).

In sum, we hold that Article III is not violated when a magistrate conducts extradition proceedings pursuant to Rule 9. *Accord Ward v. Rutherford,* 921 F.2d 286, 289 (D.C.Cir.1990) (Article III not offended by section 3184 or local rule authorizing magistrates to conduct extradition proceedings).

### II. *Sufficiency of the Evidence*

Finally, Austin renews the argument made to the district court (and properly preserved) that the evidence presented at his extradition hearing did not warrant the finding of extraditability. Austin argues that the evidence relied upon by the extradition magistrate was neither "reliable" nor "credible." He also faults the district court for failing to scrutinize the extradition magistrate's determination in this regard. Finally, Austin argues that the evidence was insufficient to support probable cause to believe that Austin was guilty of murder and conspiracy to murder. We find no merit to these contentions.[4]

---

4. Austin also argues that documentary evidence was improperly admitted against him under the relevant statute. 18 U.S.C. § 3190. Because

this non-jurisdictional argument is made for the first time on appeal, we decline to consider it. *See Jhirad,* 536 F.2d at 486.

Austin's challenge to the reliability and credibility of the evidence is misdirected. "The credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extraditing magistrate." *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986). It is clear to us from the record of the proceedings, moreover, that the extradition magistrate did in fact make such a determination: "[W]hile those affidavits contain hearsay, there's a level of consistency among those affidavits that comes from several different quarters that the Court believes renders that information reliable." Transcript of Magistrate's Decision at 5. Habeas review in the district court is not an occasion to review such a determination. *See Melia v. United States*, 667 F.2d 300, 302 (2d Cir.1981) ("The scope of [habeas] review is limited and should not be converted into a de novo review of the evidence.").

Nor are we persuaded that the evidence was insufficient to support probable cause to extradite. No doubt, the evidence tying Austin to the shooting of Wilson is circumstantial, and less than overwhelming. However, the foreign government is not required to present its entire case in this country. *See Quinn*, 783 F.2d at 815. The evidence presented need only "support a reasonable belief that [Austin] was guilty of the crime[s] charged." *Ahmad*, 910 F.2d at 1066. We agree with the district court that the evidence presented to the magistrate sufficed for this limited purpose.

## CONCLUSION

Accordingly, the judgment of the district court is affirmed.