**In the Matter of the EXTRADITION OF Luis Castaneda VARGAS.**

**Misc. Action No. L–13–213.**

United States District Court, S.D. Texas, Laredo Division.

Oct. 18, 2013.

---

Jesus M. Dominguez, Attorney at Law, Laredo, TX, for Luis Castaneda Vargas.

## MEMORANDUM & ORDER

J. SCOTT HACKER, United States Magistrate Judge.

Before the Court is the United States Government's Extradition Request made on behalf of the Mexican Government, which seeks the extradition of LUIS CASTANEDA VARGAS ("Respondent") for an alleged homicide committed in Mexico. For the reasons set forth below, the Court is of the opinion that the Extradition Request should be granted, and thus Respondent will be certified as extraditable.

### I. Extradition Process

The process of extraditing a fugitive from the United States to Mexico is governed by the provisions of the federal extradition statute, 18 U.S.C. §§ 3181–3196, and the extradition treaty between the United States and Mexico ("the Treaty"). Pursuant to the Treaty, the United States and Mexico mutually agree to extradite fugitives who are charged with crimes in one country and subsequently found within the territory of the other. Extradition Treaty, U.S.-Mex., art. 1, May 4, 1978, 31 U.S.T. 5059. "It is well settled that the terms of an extradition treaty should be liberally construed so as to effect the intention of the parties to secure the open and reciprocal surrender of fugitives to be tried for extraditable offenses." *In re Extradition of Rodriguez Ortiz,* 444 F.Supp.2d 876, 883 (N.D.Ill.2006) (citing

*Factor v. Laubenheimer,* 290 U.S. 276, 293–94, 54 S.Ct. 191, 78 L.Ed. 315 (1933)); *see also United States v. Wiebe,* 733 F.2d 549, 554 (8th Cir.1984).

▮ The foreign extradition process begins with the discovery of a foreign fugitive within the territory of the United States. Mexico may then request the provisional arrest of the fugitive, and the United States must comply with a valid request. Extradition Treaty, U.S.-Mex., art. 11, May 4, 1978, 31 U.S.T. 5059. To be valid, a request must contain a description of the person sought, a description of their alleged crimes, a declaration regarding the existence of a warrant for their arrest, and an undertaking to submit a formal request for extradition. *Id.* A judicial officer is authorized to issue a warrant for the arrest of any fugitive whose extradition is requested, upon a sworn complaint charging the fugitive with committing an extraditable offense. 18 U.S.C. § 3184. If a formal request for extradition and the supporting documents are not filed within sixty days of the apprehension of the fugitive, the provisional arrest must be terminated. Extradition Treaty, U.S.-Mex., art. 11, May 4, 1978, 31 U.S.T. 5059. However, a termination of the provisional arrest will not prejudice the extradition once the required documents have been submitted. *Id.*

▮ The second stage in the extradition process is the submission of a formal request for extradition. The formal request for extradition, along with the supplementary documents, must be submitted through diplomatic channels. Extradition Treaty, U.S.-Mex., art. 10, May 4, 1978, 31 U.S.T. 5059. Among the supplementary documents required for a fugitive not yet convicted in the foreign country are a certified copy of the warrant for the fugitive's arrest issued by a judge of the requesting party, and "[e]vidence which, in accordance with the laws of the requested Party, would justify the apprehension and commitment for trial of the person sought if the offense had been committed there." *Id.* Documentary evidence proffered by the Mexican government shall be admissible in evidence if it is properly authenticated and certified by the principal consular officer of the United States in Mexico. *Id.;* 18 18 U.S.C. § 3190.

▮ The next stage is an extradition hearing, where the federal court must hear the evidence and determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. "Extradition shall be granted only if the evidence be found sufficient according to the laws of the requested Party ... to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place." Extradition Treaty, U.S.-Mex., art. 3, May 4, 1978, 31 U.S.T. 5059. As will be discussed more fully below, where extradition is sought from the United States, the evidence must support a finding of probable cause that the person committed the extraditable offense.

▮▮ Finally, having determined that the evidence is sufficient to warrant extradition, the judge then certifies to the Secretary of State that the fugitive may be detained and surrendered to the requesting country and forwards to the Secretary all the evidence taken. 18 U.S.C. § 3184; *Ntakirutimana v. Reno,* 184 F.3d 419, 422 (5th Cir.1999). "The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct foreign affairs." *Escobedo v. United States,* 623 F.2d 1098, 1105 (5th Cir.1980). Thus, the executive branch, through the Secretary of State, is the final arbiter of whether an

individual will be detained in the United States and delivered to the requesting country. *See* 18 U.S.C. § 3186; *see also Garcia–Guillern v. United States,* 450 F.2d 1189, 1192 (5th Cir.1971). If extradition is granted, surrender shall be made at such time and place as determined according to the laws of the requested country, the United States. Extradition Treaty, U.S.-Mex., art. 3, May 4, 1978, 31 U.S.T. 5059.

## II. Background

### A. Federal proceedings

On May 3, 2013, the Government initiated extradition proceedings against Respondent upon the filing of a "Complaint for Arrest for the Purpose of Extradition." (Dkt. No. 2). According to the complaint, Mexico has invoked the Treaty and asks for Respondent's provisional arrest. (*Id.* at ¶ 4). Respondent is wanted on a Mexican arrest warrant for the crime of homicide. (*Id.* at ¶ 5). More specifically, Respondent is accused of shooting and killing Daniel Rodriguez Ramos on a public street corner in Nuevo Laredo, Tamaulipas, Mexico. (*Id.* at ¶ 6).

An arrest warrant issued from this Court (Dkt. No. 3), and Respondent was arrested on May 7, 2013 in Laredo, Texas (Dkt. No. 5). At his initial appearance the following day, Respondent was appointed counsel and advised of his rights and the charges against him.[1] (Dkt. No. 6). He was also ordered detained. (*Id.*). On May 10, 2013, the Court issued a Scheduling Order, which set a date for an extradition hearing. (Dkt. No. 9).

Thereafter, the Government filed a notice regarding the submission of the two exhibits it intended to introduce at the pending hearing.[2] (Dkt. No. 13). Exhibit 1 is titled "Certificate to be Attached to Documentary Evidence Accompanying Requisitions in the United States for Extradition American Foreign Service," and Exhibit 2 is titled "United States Department of State, Certification of Authenticity." Exhibit 2 is comprised of documents authenticating the attached formal extradition request, which was made by the Government of Mexico through a diplomatic note on July 5, 2013. Exhibit 1 is comprised of the supporting documentation required by the Treaty, including the reports of Mexican officials who investigated the homicide at issue and written witness statements. The supporting documents were authenticated in accordance with 18 U.S.C. § 3190 by John B. Brennan, Minister Counselor for Consular Affairs.

The extradition hearing was held as scheduled on September 16, 2013. Admitted into evidence, without objection, were Exhibits 1 and 2. (Sept. 16th Hr'g at 9:21, 9:23–24 a.m.). The Government addressed the elements that must be met for extradition and moved for a probable cause finding based on the documentary evidence, which it went on to summarize. (*Id.* at 9:22–9:25, 9:39–9:40 a.m.). Respondent then advanced two main arguments against extradition.

Respondent's arguments are as follows. First, Respondent challenges probable cause on the basis that the written statement of the one eyewitness to the homicide arguably contradicts the findings in the report of the victim's autopsy. (*Id.* at 9:25–9:30, 9:42–9:44 a.m.). The eyewitness claimed that he saw Respondent shoot at

---

1. Initially, the Federal Public Defender was appointed to represent Respondent. (Dkt. Nos. 1, 6). However, Respondent subsequently retained private counsel. (Dkt. Nos. 11, 12).

2. This notice was filed on September 6, 2013. (Dkt. No. 13).

the victim, who raised his hands to shield himself. The autopsy report indicates that the victim was shot in the back. Next, Respondent argues non-extraditability on the basis that he was overcharged by Mexican authorities. (*Id.* at 9:31–9:34, 9:44 a.m.). According to Respondent, Mexico recognizes two forms of homicide: the simple homicide charged here and a lesser form involving the presence of mitigating circumstances like self-defense. Respondent argues, based on the circumstances, that the lesser form of homicide should apply. This lesser charge supposedly carries a minimum sentence of only six months. Respondent's position is that this imprisonment term renders the lesser form of homicide a non-extraditable offense. Respondent's arguments are addressed below.[3]

### B. Crime and investigation

The homicide at issue occurred on August 2, 2003 in Nuevo Laredo, Tamaulipas, Mexico. The main eyewitness to the crime was an Adrian Perez Garcia. According to Mr. Perez, he was driving south with his wife and three minor children on Reynaldo Garza Avenue at around 9:30 or 10:00 in the evening. (Ex. No. 4 at 1).[4] Approaching the corner of Pino Suarez Street, they encountered a backup in traffic. (*Id.*). A man exited from the car at the front of the line and signaled the rest of the drivers to wait, apparently because he was experiencing engine failure. (*Id.* at 1–2). Mr. Perez recognized this man to be Respondent, whom he had known for two years as a former co-worker at a Kentucky Fried Chicken in Laredo, Texas.[5] (*Id.*).

Upon restarting his car's engine, Respondent made a west turn onto Pino Suarez Street. (*Id.* at 2). However, just as he passed the street corner, Respondent's engine failed again. (*Id.*). Turning west onto Pino Suarez himself, Mr. Perez encountered Respondent by his car. (*Id.*). Respondent, who appeared to be drunk, asked for help pushing his car to the next corner. (*Id.*). Although hesitant, Mr. Perez agreed to help because Respondent's car obstructed the street. (*Id.*). Mr. Perez parked half-way up the block, outside his mother-in-law's house, and walked back to Respondent's car. (*Id.*). His wife took the kids to her mother's. (*Id.*).

When Mr. Perez reached Respondent's car, he pushed it by himself until it was properly positioned by the sidewalk. (*See id.*). That is when Mr. Perez noticed that Respondent had made his way to the corner of Pino Suarez and Reynaldo Garza, where he was arguing with another man, Daniel Rodriguez Ramos, the victim. (*Id.*). Mr. Perez was familiar with this man, as Mr. Rodriguez lived near the

---

3. Apart from these arguments, Respondent noted that pending in his case before the Mexican courts was a hearing on a writ of *amparo* (Sept. 16th Hr'g at 9:34–9:36 a.m.), a means similar to *habeas corpus* that is used to review and annul unconstitutional judicial decisions, *United States v. Fowlie*, 24 F.3d 1059, 1064 (1994). Respondent suggests that a favorable ruling by the Mexican courts will impact these extradition proceedings. However, Respondent has yet to advise the Court as to the outcome of the *amparo* hearing, which was supposed to have been held on September 19, 2013.

4. As discussed above, the Government's "Certificate to be Attached to Documentary Evidence Accompanying Requisitions in the United States for Extradition American Foreign Service" is comprised of documents supporting Mexico's extradition request. These documents are attached to the Certificate as a series of numbered exhibits. Any citations to exhibit numbers in this Order refer to the exhibits attached to the Certificate.

5. Respondent left his job at the restaurant about one year prior to the date of the homicide. (Ex. No. 4 at 1–2).

home of Mr. Perez' mother. (*Id.* at 1). Given Respondent's drunken state, Mr. Perez paid little attention to the subject of the argument. (*Id.* at 2). Nonetheless, upon moving the car from the street, Mr. Perez decided to drop off Respondent's keys at his house, located about five houses down the street. (*Id.*). Once there, Mr. Perez handed the keys to Respondent's mother, who happened to be outside. (*Id.*).

While walking back to his mother-in-law's home, Mr. Perez heard a gunshot and turned his head towards the corner of Pino Suarez and Reynaldo Garza. (*Id.*). There he saw Respondent holding a gun and shooting at Mr. Rodriguez. (*Id.*). Mr. Rodriguez held up his hands as if to shield himself from the bullets. (*Id.*). Mr. Perez heard four shots in rapid succession, immediately ran towards his mother-in-law's, and got up on the porch. (*Id.*) He then saw Respondent run past the porch, west along Pino Suarez Street. (*Id.*).

Mr. Rodriguez was taken to the hospital by a Roberto De La Cruz Rodriguez. (Ex. No. 5.) According to Mr. De La Cruz, he was at his home on Pino Suarez Street watching television. (*Id.*) At around 10:00 p.m., he heard someone call his nickname, "Chuky," from outside. (*Id.*). He recognized the voice as that of the victim, Mr. Rodriguez, his wife's cousin. (*Id.*). Mr. Rodriguez apparently became frustrated in waiting for Mr. De La Cruz, so he walked away. (*Id.*). When Mr. De La Cruz finally went outside, he heard three gunshots and ran to the corner of his house to see what was happening. (*Id.*). There he saw Mr. Rodriguez on the ground, bleeding from the mouth and chest. (*Id.*). That is when Mr. De La Cruz drove Mr. Rodriguez to the nearest hospital, the Hospital Civil. (*Id.*). Within minutes, a nurse informed him that Mr. Rodriguez was dead. (*Id.*).

Later that night, a Ricardo Mancillas Castillo, Fourth Investigative Agent of the Public Prosecutor in the State of Tamaulipas, arrived at the emergency room to perform an initial inspection of the body. (Ex. No. 8 at 1). Also there to identify the body was Mr. Rodriguez' wife, Alma Delia Esquivel Martinez. (*See id.*). With the inspection and identification complete, Investigator Mancillas officially ordered police to begin an investigation into the homicide. (Ex. No. I at 4; Ex. No. 8 at 1–2). By this point, police had found a .25 caliber shell casing at the corner of Pino Suarez and Reynaldo Garza. (Ex. No 8 at 2). They had also recovered Respondent's car, a black Chevrolet Cavalier bearing Texas license plates. (*Id.*; Ex. No. 9 at 3). In the car were a "United States Social Security Notification" in the name of a Luis Castaneda and a color photograph depicting two women and a seated man wearing a blue and red shirt. (*See* Ex. No. 1 at 3; *see also* Ex. No. 9 at 3).

In addition to the police investigation, Investigator Mancillas ordered a necropsy. (Ex. No. 8 at 1–2). The necropsy was conducted in the early morning hours of August 3, 2003 at the funeral parlor La Paz by a Jesus Ramos Salazar, a medical forensic expert. (Ex. No. 10 at 1, 3). The forensic expert observed two bullet entrance wounds through the back and one exit wound through the left chest. (*Id.* at 1). He concluded that the cause of death was "bodily injuries due to a firearm projectile penetrating both thorax [sic] with h[e]mothorax, heart blockage[,] and hypovolemic shock." (*Id.* at 3).

Later that day, Investigator Mancillas began interviewing witnesses, including Mr. Perez, Mr. De La Cruz, and the victim's father, Horacio Rodriguez Garcia. (Ex. Nos. 4, 5, 6). Mr. Perez and Mr. De La Cruz each provided written statements, recounting the circumstances detailed

above. (Ex. Nos. 4, 5). They were also presented with the photo retrieved from the Chevrolet Cavalier. (Ex. No. 4 at 2; Ex. No. 5 at 1). Mr. Perez identified the man in the photo as Respondent. (Ex. No. 4 at 2). Although Mr. De La Cruz did not see who committed the shooting, he claimed to know Respondent and recognized him from the photo as well. (Ex. No. 5 at 1).

Mr. Horacio Rodriguez also provided a written statement (Ex. No. 6), thereby shedding some light on a possible motive for the homicide. According to Mr. Horacio Rodriguez, around 10:00 p.m. the previous night, his son asked to be dropped off at the corner of Pino Suarez and Reynaldo Garza so he could run a quick errand. (Id. at 1). When his son exited the truck, Mr. Horacio Rodriguez saw Respondent at the corner. (Id.). Mr. Horacio Rodriguez claimed that Respondent "had problems" with this son. (Id.). For some reason unknown to Mr. Horacio Rodriguez, the two had exchanged blows some three or four months earlier. (Id.). Mr. Horacio Rodriguez was also shown the photo retrieved from the Cavalier, and like Mr. Perez and Mr. De La Cruz, he identified Respondent. (Id.).

Several days later, on August 19, 2003, Investigator Mancillas took the statement of a Benjamin Garcia Lopez, an auto mechanic who had employed Mr. Rodriguez at his garage and who also happened to be Respondent's neighbor. (Ex. No. 7 at 1–2). Mr. Garcia further confirmed the motive for the homicide. One day, Mr. Rodriguez supposedly told Mr. Garcia of an argument with Respondent that resulted in an exchange of blows. (Id. at 1). Mr. Rodriguez claimed to have delivered such a beating that Respondent had to seek medical attention at the hospital. (Id.). Soon thereafter, Mr. Garcia fired Mr. Rodriguez at the behest of his landlord. (Id.

at 1–2). Apparently, the landlord was concerned that the altercation would lead to problems at the garage. (Id.). Around three months later, Mr. Garcia was outside his house when he ran into Respondent. (Id. at 2). Respondent claimed to have purchased a gun so he could kill Mr. Rodriguez in revenge for the beating. (Id.). Sometime after that, Respondent appeared at Mr. Garcia's garage. (Id.). Seemingly intoxicated, Respondent threatened that if Mr. Garcia continued to allow Mr. Rodriguez in the garage, Respondent would kill him too. (Id.). In addition to giving his statement, Mr. Garcia identified Respondent from the above-referenced photograph. (Id.).

A criminal accusation would then be filed against Respondent. (See Ex. No. I at 3; see also Ex. No. 1 at 1). Prosecutors compiled an investigative report and submitted it to the First Criminal Trial Court for the Third Judicial District of Tamaulipas as part of their application for an arrest warrant. (See Ex. No. I at 3; see also Ex. No. 1 at 1). On September 1, 2003, Judge Jose Jaime Palacios Salinas issued the warrant for Respondent's arrest. (Ex. No. 1).

Apparently the investigation remained open for the next several years. On October 12th and 13th of 2010, respectively, Mr. Horacio Rodriguez and Mr. Perez took part in formal identification proceedings. (Ex. Nos. 11, 12). As part of the identification procedures, they were each presented with the photographs of six males. (Id.). Mr. Horacio Rodriguez and Mr. Perez each correctly identified Respondent as the individual depicted in photo number six. (Id.).

### III. Discussion

#### A. Legal Standard

Extradition treaties create a binding obligation on the United States to surrender fugitives to its treaty partners

once the fugitives are found to be extraditable. *See Wright v. Henkel,* 190 U.S. 40, 62, 23 S.Ct. 781, 47 L.Ed. 948 (1903); *see also Allen v. Schultz,* 713 F.2d 105, 107–108 (5th Cir.1983); Extradition Treaty, U.S.-Mex., art. 13, ¶ 3, May 4, 1978, 31 U.S.T. 5059. Foreign extradition is *sui generis* in nature, neither civil nor criminal, and is controlled by a self-contained body of law. *See United States v. Doherty,* 786 F.2d 491, 498 n. 9 (2d Cir.1986) (collecting cases); *In re Extradition of Nava Gonzalez,* 305 F.Supp.2d 682, 689 (S.D.Tex.2004); *see also Sayne v. Shipley,* 418 F.2d 679, 685 (5th Cir.1969) ("[T]he procedural framework of international extradition gives to the demanding country advantages most uncommon to ordinary civil and criminal litigation.").

 As discussed above, a potential extraditee is entitled to a hearing before a federal judge so "that the evidence of criminality may be heard and considered." *See* 18 U.S.C. § 3184. At the hearing, the presiding judge is not required to make a determination of guilt or innocence. *See* Extradition Treaty, U.S.-Mex., art. 3, May 4, 1978, 31 U.S.T. 5059. Rather, the purpose of an extradition hearing is to provide a judicial determination that extradition is proper under the circumstances. A request for extradition should be granted based on the following requirements: (1) the presiding judicial officer has jurisdiction to conduct an extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the person before the court is the fugitive named in the request for extradition; (4) there is an extradition treaty in full force and effect; (5) the crimes for which surrender is requested are covered by that treaty; and (6) there is competent legal evidence to support the finding of probable cause as to each charge for which extradition is sought. *In re Extradition of*

*Garcia,* 825 F.Supp.2d 810, 826–27 (S.D.Tex.2011).

### B. Analysis

Upon a review of the record and the parties' arguments, the Court concludes that all of the above requirements have been met. Each will be discussed in turn.

#### 1. Jurisdiction and identity

The statute governing extradition proceedings authorizes a broad class of judicial officers to hear extradition cases. *See* 18 U.S.C. § 3184. Federal magistrate judges may hear and decide extradition cases if "authorized to do so by a court of the United States." *In re Extradition of Ramos Herrera,* 268 F.Supp.2d 688, 693 (W.D.Tex.2003) (quoting 18 U.S.C. § 3184) (internal quotations omitted). Pursuant to General Order 2002–13, addressing the authority of magistrate judges in the Southern District of Texas, "[a] magistrate judge is authorized to handle all matters pertaining to extradition complaints filed pursuant to 18 U.S.C. § 3184." The extradition statute also provides that jurisdiction will apply to any person found within the jurisdiction of the court. 18 U.S.C. § 3184. Respondent was initially found, and is now in federal custody, within the jurisdiction of the Southern District of Texas. Respondent disputes neither the undersigned's jurisdiction over the extradition proceeding, nor the Court's jurisdiction over his person. Furthermore, Respondent does not challenge that he is the Luis Castaneda Vargas sought by Mexican authorities for the killing of Mr. Rodriguez. Thus, the first three extradition requirements are not at issue.

#### 2. Existence of an extradition treaty

The Government has submitted a declaration from Julie B. Martin, an "Attorney Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C.," dated July 30, 2013, which verifies

that the Treaty between the United States and Mexico was signed on May 4, 1978 and is presently in full force and effect. A copy of the Treaty is attached to the Ms. Martin's declaration. Respondent does not contest the Treaty's existence.

### 3. Whether the charged offense is covered by the Treaty

 Under 18 U.S.C. § 3184, extradition will be considered where there is a sworn complaint charging the fugitive with a crime provided for in the Treaty. In accordance with the principle of "dual criminality, the act on which the extradition request is founded must be considered a crime in both jurisdictions." *Nava Gonzalez,* 305 F.Supp.2d at 689–90 (citation omitted); *see also United States v. Ramnath,* 533 F.Supp.2d 662, 673 (E.D.Tex. 2008). More specifically, if the offense which Mexico seeks to prosecute is included within the Appendix to the Treaty, the offense must be punishable in both the United States and Mexico "by deprivation of liberty[,] the maximum of which shall not be less than one year." Extradition Treaty, U.S.-Mex., art. 2, ¶ 1, May 4, 1978, 31 U.S.T. 5059.

 Here, the offense of murder is included within the Appendix to the Treaty. Extradition Treaty, U.S.-Mex., Appendix, May 4, 1978, 31 U.S.T. 5059. Pursuant to Articles 329 and 333 of the Criminal Code for the State of Tamaulipas, the equivalent offense of simple intentional homicide, committed by whomever "takes the life of another," is punishable by twelve to twenty years of imprisonment. (Ex. No. I at 6; Ex. No. 1 at 5; Ex. No. 3 at 2). Murder is also an offense under both federal law and the laws of Texas and is punishable by more than one year im-

prisonment.[6] *See* 18 U.S.C. § 1111; *see also* Tex. Penal Code §§ 12.32 and 19.02. Furthermore, Ms. Martin declares that "[t]he offense for which extradition is sought is punishable in accordance with the laws of both contracting parties by deprivation of liberty for a period of at least one year, and is covered under Article 2 of the Extradition Treaty between the United States of America and the United Mexican States of May 4, 1978." Ms. Martin's opinion provides substantial evidence of dual criminality. *See In re Extradition of Salazar,* 2010 WL 2925444, at *4 (S.D.Cal. July 23, 2010) (citing *Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961) (recognizing that State Department's opinion on whether a crime is covered by a treaty is entitled to weight and deference)).

Respondent challenges extradition on the basis that he was overcharged. According to Respondent, Mexico recognizes a lesser form of homicide involving the presence of mitigating circumstances like self-defense. According to Respondent, the circumstances are such that he should have been charged with this lesser form of homicide, which supposedly carries a minimum sentence of only six months. Respondent's position is that this term of imprisonment renders the lesser form of homicide a non-extraditable offense.

 This argument is futile. Indeed, "the determination of whether a crime is within the provisions of an extradition treaty is within the sole purview of the requested country." *In re Extradition of Cervantes Valles,* 268 F.Supp.2d 758, 770 (S.D.Tex.2003) (citation omitted). In this regard, the Court concludes (and it is

---

**6.** "Dual criminality is generally measured by comparing the charged offense to conduct proscribed by federal law, the law of the asylum state, or the laws of a preponderance of states." *In re Extradition of Diaz Medina,* 210 F.Supp.2d 813, 816 n. 2 (N.D.Tex.2002) (citing *In re Extradition of Prushinowski,* 574 F.Supp. 1439, 1446 (E.D.N.C.1983)).

not disputed) that Respondent has been charged in Mexico with simple intentional homicide and that this offense is covered by the Treaty. Otherwise, the Court simply lacks authority to consider the Mexican prosecutors' charging decisions.[7] Even assuming such authority exists, a six-month minimum sentence does not necessarily render an offense non-extraditable. The text of the Treaty makes reference, not to a minimum term of imprisonment, but to a maximum term. As discussed, the offense must be punishable "by deprivation of liberty[,] the *maximum* of which shall not be less than one year." Extradition Treaty, U.S.-Mex., art. 2, ¶ 1, May 4, 1978, 31 U.S.T. 5059 (emphasis added).

As such, the Court concludes that homicide is an extraditable offense under the Treaty. *See Cervantes Valles,* 268 F.Supp.2d at 771.

### 4. Whether the evidence justifies commitment for trial in Mexico

█ The Court is charged with determining whether the evidence is sufficient to sustain the charges under the provisions of the Treaty. *See Cervantes Valles,* 268 F.Supp.2d at 771 (citing 18 U.S.C. § 3184). Pursuant to the Treaty, extradition shall be granted only if the evidence is found sufficient, according to the laws of the requested party, to justify the committal for trial. Extradition Treaty, U.S.-Mex., art. 3, ¶ 1, May 4, 1978, 31 U.S.T. 5059. In the United States, this requires a showing of probable cause. *See Cervantes Valles,* 268 F.Supp.2d at 771–72. Thus, the federal standard of probable cause is what courts apply in international extradition cases. *Ramnath,* 533 F.Supp.2d at 679 (citing *Garcia–Guillern,* 450 F.2d at 1192); *see also Jimenez v. Aristeguieta,* 311 F.2d 547, 562 (5th Cir.1962).

█ Under this standard, the Government is not required to present evidence sufficient to convict. *Ramnath,* 533 F.Supp.2d at 679 (citing *Collins v. Loisel,* 259 U.S. 309, 316, 42 S.Ct. 469, 66 L.Ed. 956 (1922)). Rather, probable cause is the existence of reasonable grounds to believe the accused committed the charged offense. *Sayne,* 418 F.2d at 685; *Cervantes Valles,* 268 F.Supp.2d at 772 (citation omitted). The law thus requires evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. *Cervantes Valles,* 268 F.Supp.2d at 772; *Nava Gonzalez,* 305 F.Supp.2d at 691. "In making this determination, courts apply a totality of the circumstances analysis and make a practical, common sense decision whether, giv-

---

7. Respondent argues that Rule 26.1 of the Federal Rules of Criminal Procedure enables the Court to look into this issue of foreign law. However, Rule 26.1 plays a more limited role. The text of Rule 26.1 reads as follows:

A party intending to raise an issue of foreign law must provide the court and all parties with reasonable written notice. Issues of foreign law are questions of law, but in deciding such issues a court may consider any relevant material or source—including testimony—without regard to the Federal Rules of Evidence.

Fed.R. Crim.P. 26.1. Generally, "Rule 26.1 gives the district court broad discretion in considering evidence to make determinations of foreign law." *United States v. Chao Fan Xu,* 706 F.3d 965, 986 (9th Cir.2013). The Rule's Advisory Committee notes recognize that foreign law determinations may arise in an extradition proceeding, but simply for purposes of examining whether there are "reasonable ground[s] to believe that the person sought to be extradited is charged with, or was convicted of, a crime under the laws of the demanding state . . . ." *See* Fed.R. Crim.P. 26.1, Advisory Committee's Notes, 1944 Addition. Again, based on the sources discussed above, it is the Court's determination that Respondent has been charged with a crime under the laws of Mexico.

en all the circumstances, there is a fair probability that the defendant committed the crime." *Rodriguez Ortiz,* 444 F.Supp.2d at 884 (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)) (internal quotations omitted).

 Notably, the extradition hearing is akin to a preliminary hearing under Federal Rule of Criminal Procedure 5.1, and is not a trial on the merits to determine whether the accused is guilty or innocent of the underlying criminal allegations. *See Escobedo,* 623 F.2d at 1102 n. 5 (citing *Sayne,* 418 F.2d at 685); *see also Cervantes Valles,* 268 F.Supp.2d at 772; *Nava Gonzalez,* 305 F.Supp.2d at 691. At the hearing, the Federal Rules of Evidence and the Federal Rules of Criminal Procedure do not apply. *See In re Extradition of Diaz Medina,* 210 F.Supp.2d 813, 815 (N.D.Tex.2002) (citing Fed.R.Evid. 1101(d)(3) and Fed. R. Crim. Proc. 54(b)(5), moved to Rule (a)(5)(A)); *see also Sayne,* 418 F.2d at 685 ("Unique rules of 'wide latitude' govern reception of evidence in Section 3184 hearings."). Indeed, the Supreme Court has found that extradition may be predicated entirely on the "unsworn statements of absent witnesses." *Collins,* 259 U.S. at 317, 42 S.Ct. 469. Nonetheless, "[w]hen a court in an extradition proceeding is presented with evidence through affidavits, the court may conclude, on a review of the affidavits submitted, that there are insufficient [or sufficient] indicia of reliability or credibility to establish probable cause." *In re Extradition of Singh,* 124 F.R.D. 571, 577 (D.N.J.1987); *Eain v. Wilkes,* 641 F.2d 504, 509–11 (7th Cir.1981) (finding the affidavits of an accomplice, corroborated by the affidavits of a police officer and a second civilian witness, were sufficient to establish probable cause). "The admission and evaluation of evidence in extradition proceedings is com-

mitted to the sound discretion of the court." *In re Extradition of Gonzalez,* 52 F.Supp.2d 725, 737 (W.D.La.1999) (citing *Collins,* 259 U.S. at 316, 42 S.Ct. 469).

 Here, based on the totality of the circumstances, the Court concludes there is probable cause to believe that Respondent committed the crime of murder. First, there was an eyewitness, Mr. Perez, who claims he saw an intoxicated Respondent point and fire a gun at the victim and then run from the scene. A second witness, Mr. Horacio Rodriguez, the victim's father, placed Respondent at the scene immediately before the shooting. Moreover, Mr. Horacio Rodriguez indicated a possible motive for the crime. Supposedly, months before the shooting, the victim told Mr. Horacio Rodriguez that he entered into a physical altercation with Respondent. The revenge-killing motive was corroborated by a third witness, Mr. Garcia, the victim's one-time employer and Respondent's neighbor. Mr. Garcia claims that the victim relayed to him a similar story about an altercation with Respondent. Mr. Garcia also alleges that he was confronted several times by Respondent himself. On one occasion, Respondent allegedly told Mr. Garcia he had purchased a gun to kill Mr. Rodriguez. On another claimed occasion, Respondent showed up drunk and threatened Mr. Garcia with his life if he continued to allow Mr. Rodriguez onto the workplace. Furthermore, the medical evidence establishes that Mr. Rodriguez died as the result of a gunshot wound.

 Respondent challenges probable cause by questioning the credibility of Mr. Perez. Again, Mr. Perez claims that as Respondent fired his gun, Mr. Rodriguez raised his hands as if to shield himself from the bullets. According to Respondent, these assertions are contradicted by

the autopsy report, which indicates that the bullets entered the back of the body.

■ However, under the general rule of non-contradiction, the accused in an extradition hearing has no right to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains away that proof or completely rebuts the existence of probable cause. *See Cervantes Valles*, 268 F.Supp.2d at 772 (citing *Matter of Extradition of Contreras*, 800 F.Supp. 1462, 1464 (S.D.Tex.1992)); *see also Eain*, 641 F.2d at 511. In other words, evidence merely contradicting the credibility of witnesses is not allowed.[8] Here, regardless of the claimed inconsistency and its potential effect on the criminal case in Mexico, Respondent has failed to either explain away or completely rebut probable cause for purposes of the instant proceeding. *See Barapind v. Enomoto*, 400 F.3d 744, 749–50 (9th Cir.2005) (affirming the determination that there was sufficient evidence to support the probable cause finding but recognizing that there was conflicting evidence and credibility determinations that would need to be resolved by a trial in the requesting country).

■ Should a court choose to entertain any credibility arguments, the weight to be accorded to the witness testimony is solely within the court's province. *Ntakirutimana*, 184 F.3d at 429 (citing *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir.1986)). In this regard, the Court is of the opinion that Mr. Perez' eyewitness account is not necessarily in conflict with the autopsy report. Respondent and Mr. Rodriguez were engaged in an argument, so Mr. Rodriguez probably stood facing Respondent when Respondent started firing his weapon. Instinctively, Mr. Rodriguez raised his arms to shield himself from the initial shots. These could very well have missed their target because of Respondent's intoxicated state. Next, Mr. Rodriguez likely turned around to run, and that is when he was hit in his back by the two bullets referenced in the autopsy report. Moreover, the Court finds Mr. Perez to be a credible witness, as his story is supported by several indicia of reliability. For one, Mr. Perez claimed that he helped Respondent push his car off the street by the corner where the shooting occurred. The Chevrolet Cavalier found in that location by investigators was indisputably linked to Respondent through the documents found inside. Also, the claim by Mr. Perez that Respondent was drunk when he committed the crime was corroborated by Mr. Garcia. Mr. Garcia's assertions regarding the

---

8. *See Garza v. United States*, 180 Fed.Appx. 522, 523 (5th Cir.2006) (holding that it was not error for committing court to refuse to admit an affidavit from a private investigator that provided evidence of a witness's lack of credibility where "the affidavit would not have explained away the witness's testimony, but only challenged its credibility"); *see also Austin v. Healey*, 5 F.3d 598, 605 (2d Cir. 1993) (stating that respondent's challenge to "the reliability and credibility of the evidence is misdirected"); *In re Extradition of Mainero*, 990 F.Supp. 1208, 1218 (S.D.Cal.1997) ("Evidence that conflicts with that submitted on behalf of the demanding party is not permitted, nor is impeachment of the credibility of the demanding country's witnesses."); *United States v. Peterka*, 307 F.Supp.2d 1344, 1349 (M.D.Fla.2003) (at extradition hearing, "the court shall exclude evidence that is proffered to . . . challenge the credibility of witnesses"); *Rodriguez Ortiz*, 444 F.Supp.2d at 891–93 (holding that the issue of inconsistencies in witness statements are "properly reserved for the eventual trial in Mexico"); *In re Extradition of Solis*, 402 F.Supp.2d 1128, 1131 (C.D.Cal.2005) (holding that respondent could not challenge the veracity or validity of a witness's statement because "a fugitive in international extradition proceedings is not permitted to introduce evidence that contradicts the evidence submitted by the requesting country").

threats he received from an intoxicated Respondent support the notion that Respondent had a proclivity towards violence while under the influence of alcohol.

■ Regardless, "an air-tight narrative of the events surrounding a crime is not a precondition for granting extradition." *Rodriguez Ortiz*, 444 F.Supp.2d at 891–93. At the very least, Mr. Perez identified Respondent as the shooter. Mr. Horacio Rodriguez saw Respondent at the corner where the shooting occurred. Also, Mr. Horacio Rodriguez and Mr. Garcia identified Respondent as someone who had a vendetta against Mr. Rodriguez. To the extent Respondent raises flaws in the identification procedures employed by Mexican authorities, the Court finds that the above witness identifications were reliable.

■ "[T]here exists no rule specifying which identification procedures are competent for use in extradition proceedings, and such evidence need not be rejected merely because United States procedures governing the admissibility of an identification at trial were not followed." *Cervantes Valles*, 268 F.Supp.2d at 773 (citing 31A Am.Jur.2d Extradition § 104). Nonetheless, the identification evidence must be both sufficiently reliable and competent for purposes of determining probable cause. *Cervantes Valles*, 268 F.Supp.2d at 773. In a domestic criminal case, a two-step analysis is employed to determine whether the district court erred in admitting identification evidence. *United States v. Burbridge*, 252 F.3d 775, 780 (5th Cir.2001). The Court must first determine whether the identification procedures were impermissibly suggestive. *Cervantes Valles*, 268 F.Supp.2d at 773 (citing *Burbridge*, 252 F.3d at 780). If the

eyewitness identification procedures were impermissibly suggestive, the Court must then determine whether the identification is independently reliable. *United States v. Honer*, 225 F.3d 549, 553 (5th Cir.2000). These same identification standards have been applied by district courts in the Fifth Circuit in the context of foreign extradition cases. *See, e.g., Cervantes Valles*, 268 F.Supp.2d at 773–74; *Gonzalez*, 52 F.Supp.2d at 737–38.

■ In the days following the shooting, Mr. Perez, Mr. Horacio Rodriguez, and Mr. Garcia all identified Respondent from the photo found in his car.[9] The photo depicted two women and one man, and thus it effectively amounted to a single-photo array. Indeed, the display of a single-photo array is considered to be one a highly suggestive identification procedure. *See United States v. Sanchez*, 988 F.2d 1384, 1389 (5th Cir.1993) (citing *Manson v. Brathwaite*, 432 U.S. 98, 108–9, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). However, several factors must be considered to determine the reliability of an identification, including the following: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the degree of attention paid by the witness; (3) the accuracy of the prior description of the criminal given by the witness; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

■ The consideration of the circumstances leads to the conclusion that the witness identifications were independently reliable. Mr. Perez had ample opportunity

---

9. Mr. De La Cruz also identified Respondent from the photo, but this particular identification does not support probable cause. Indeed, Mr. De La Cruz stated that he did not see who shot Mr. Rodriguez, nor did he know "whom he had problems with." (Ex. No. 5 at 1).

to observe Respondent in the moments surrounding the shooting. Mr. Perez saw the shooting occur from "close range," only half a block away. (Ex. No. 4 at 2). Moreover, as Respondent's former co-worker, Mr. Perez would have been well-familiar with Respondent's appearance, a circumstance that is entitled to significant weight. *See Watkins v. Perez,* 2007 WL 1344163, at *13–14 (S.D.N.Y. May 7, 2007); *see also Tolentino v. Brown,* 2009 WL 1347699, at *8 (S.D.N.Y. May 5, 2009); *see also King v. Mellas,* 2007 WL 601523, at *5 (N.D.N.Y. Feb. 20, 2007). Mr. Garcia referenced multiple conversations with Respondent, his neighbor. Thus, Mr. Garcia would also have been familiar with Respondent's appearance. From the context of his statement, Mr. Horacio Rodriguez seemed familiar with Respondent as well. For instance, Mr. Horacio Rodriguez knew that Respondent lived on Pino Suarez Street. (Ex. No. 6 at 1). All three witnesses claimed to "fully recognize[ ] [Respondent] without fear of error." (Ex. No. 4 at 2; Ex. No. 6 at 2; Ex. No. 7 at 2.) Lending further reliability to the identifications by Mr. Perez and Mr. Horacio Rodriguez is that fact that, more than seven years after the crime, these witnesses identified Respondent again from a non-suggestive, six-photo array.

The Court notes that a reliable identification is generally sufficient to establish probable cause. *See Escobedo,* 623 F.2d at 1102 (relying on deposition of victim identifying petitioner after being shown a single photograph of petitioner in upholding finding of probable cause); *see also Cervantes Valles,* 268 F.Supp.2d at 773 (citing *Burbridge,* 252 F.3d at 778) ("In the domestic law enforcement context, an ordinary citizen's eyewitness account of criminal activity and identification of a perpetrator is normally regarded as sufficient to supply probable cause.").

## IV. Conclusion

For these reasons, it is the Court's conclusion that the requirements for extradition have been met. These requirements include the existence of competent legal evidence supporting probable cause to believe that Respondent LUIS CASTANEDA VARGAS committed the extraditable offense charged, homicide, by shooting and killing Daniel Rodriguez Ramos on a public street corner in Nuevo Laredo, Tamaulipas, Mexico on August 2, 2003. An eyewitness identified Respondent as the person who committed the shooting, a second witness placed Respondent at the scene and discussed a possible motive for the crime, and a third witness gave corroborating statements regarding the motive. Furthermore, the medical evidence shows that Mr. Rodriguez was fatally wounded by a gunshot. As such, the Government's Extradition Request should be and is hereby **GRANTED.**

### A. Certificate of Extraditability

Having determined that the evidence proffered by the United Mexican States is sufficient to sustain the charges to justify committal for trial in accordance with the laws of the United States, Respondent LUIS CASTANEDA VARGAS is hereby **CERTIFIED** as **EXTRADITABLE** to the Secretary of State of the United States of America. Respondent shall remain in the custody of the United States Marshal and confined in a proper facility until surrender is made to a duly qualified agent of the United Mexican States, or until further order from this Court or from the Secretary of State.

### B. Directive to Clerk of Court

The Clerk of Court is hereby DIRECTED to deliver a copy of this Memorandum and Order, together with all formal extra-

dition documents received into evidence, any evidence taken at the hearings held in this matter, any memoranda of law filed on the issue of extradition, and all orders of court via certified mail (return receipt requested) to: U.S. Department of State, Secretary of State John F. Kerry, 2201 C Street NW, Washington, D.C. 20520.